WESTGATE RECREATION ASSOCIATION, APPELLEE, V.
PAPIO-MISSOURI RIVER NATURAL RESOURCES DISTRICT,
APPELLANT.

547 N.W.2d 484

Filed May 10, 1996.   No. S-94-273.

Paul F. Peters, of Schmid, Mooney & Frederick, for appellant.

James D. Sherrets and David A. Jarecke, of Sherrets, Smith & Gardner, P.C., for appellee.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.

CAPORALE, J.

## I. STATEMENT OF CASE

This is a condemnation action in which the trial court, pursuant to verdict, entered judgment in the amount of $435,000 in favor of the plaintiff-appellee condemnee, Westgate Recreation Association. In appealing to the Nebraska Court of

Appeals, the defendant-appellant condemner, Papio-Missouri River Natural Resources District, assigned a number of errors to the trial court, including that it (1) incorrectly struck certain allegations from the district's answer and (2) wrongly received certain evidence. Under our authority to regulate the caseloads of the Court of Appeals and this court, we, on our own motion, removed the matter to our docket. We now reverse the judgment of the trial court and remand for a new trial.

## II. BACKGROUND

Seeking land for its Big Papillion Creek Channel Improvement Project and its Trailhead Park Project, the district instituted this action to acquire fee title to a portion of the land owned by Westgate. Westgate used its land as a swimming pool complex, which contained a main pool, a wading pool, a bathhouse, a parking lot, a redwood pavilion, a pumphouse, a storage area, outside lighting, and a chain link fence. The line of the taking went across a corner of the main pool, making its retention infeasible. Before the taking, the land contained 143,545 square feet and was zoned development reserve/flood plain/floodway. The property actually taken contained 81,725 square feet, leaving the condemnee 61,820 square feet.

## III. ANALYSIS

With that background, we turn our attention to the assignments of error, supplying such additional facts as resolution of the issues requires.

### 1. STRICKEN ALLEGATIONS

In the first assignment of error, the district complains of the trial court's striking from the district's answer the allegations which pled, as an affirmative defense, that Westgate's acceptance of the full amount of the award of the appraisers waived any right of appeal it otherwise had.

### (a) Scope of Review

Whether allegations should be stricken presents a question of law, in connection with which a reviewing court has an obligation to reach its own conclusions independent of those

reached by the lower courts. See *Kramer v. Miskell*, 249 Neb. 662, 544 N.W.2d 863 (1996).

(b) Application of Law to Facts

The district's answer alleged that the amount awarded to Westgate by the county court appraisers was the sum of $291,569.66; that subsequent to such award, the district deposited the amount of $291,569.66 with the clerk of the county court in payment of such award; and that subsequent thereto, on or about September 17, 1991, Westgate obtained the district's stipulation and was paid by, and accepted from, the clerk of the county court the entire $291,569.66; and that having accepted the payment of the entire amount of the damages awarded, Westgate waived, and is precluded from further prosecuting, its appeal.

The district contends that the foregoing affirmative defense is based on our holding in *McCook Livestock Exchange Co. v. State*, 173 Neb. 766, 115 N.W.2d 147 (1962). The county court appraisers therein assessed the damages to the condemnee in the sum of $1,730, and the condemnee filed its notice of appeal to the district court. While the appeal was pending, the parties entered into a stipulation to release to the condemnee $1,350, an amount somewhat less than the 80 percent authorized to be released under then Neb. Rev. Stat. § 76-719.01 (Cum. Supp. 1959). However, almost 3 months before the stipulation, the condemnee's accountant had received a check of the county judge for $1,730, the full amount of the award, which was marked "For Condemnation." The accountant deposited the check to the credit of the condemnee. After the issues were joined on the appeal, the condemner successfully moved the district court to dismiss the appeal because the condemnee had ratified the award of the appraisers by acceptance of the full amount of the award from which it had appealed. We affirmed.

However, *McCook Livestock Exhange Co.* is distinguishable from the situation at hand on two separate grounds. First, § 76-719.01 has since been amended so that there no longer is a restriction on the amount authorized to be released to a condemnee. 1969 Neb. Laws, ch. 329, § 13, p. 1184. Second,

although the *McCook Livestock Exchange Co.* opinion states the general rule that a party who, after appealing from a judgment in that party's favor, voluntarily accepts the benefits or receives the advantage of the judgment is thereby precluded from afterward prosecuting his or her appeal, it also observed:

> Where in a condemnation suit a condemnee receives the full amount of an award made to it in county court by reason of a mistake in the payment, both on the part of the county judge and the condemnee's agent, and fails to pay or tender back the portion of the payment which exceeds that to which it was entitled with reasonable promptness after the discovery of the mistake, its appeal to the district court should be dismissed.

*Id.* at 770, 115 N.W.2d at 150.

Neb. Rev. Stat. § 76-719 (Cum. Supp. 1994) provides, in part, that "[i]n case an appeal is taken either to the district court or the Court of Appeals, any money deposited by the condemner shall remain in the hands of the county judge until a final judgment is rendered except as provided in section 76-719.01."

Section 76-719.01 (Reissue 1990), in effect at the time of the stipulation, provided, in part:

> Upon stipulation of the parties in interest, the county judge shall order that the amount stipulated by the parties, of the money deposited by the condemner in the county court, be paid forthwith for or on account of the damages the condemnee has sustained or will sustain by the appropriation of the property to the use of the condemner.

As Westgate received the moneys pursuant to the stipulation with the district, and because § 76-719.01 was amended as described earlier, Westgate received no money in excess of that which it was entitled to withdraw. Therefore, *McCook Livestock Exchange Co.* is inapposite.

(c) Resolution

The allegations at issue were therefore irrelevant and were properly stricken. See Neb. Rev. Stat. § 25-833 (Reissue

1995). Accordingly, there is no merit to the first assignment of error.

## 2. EVIDENCE RECEIVED

The second assignment of error claims that the trial court wrongly admitted evidence concerning comparable sales, incorrectly received the testimony concerning the cost of reproducing the pool facility, improvidently accepted evidence concerning past costs of repairs, and mistakenly refused to reject written summaries of testimonial evidence.

### (a) Scope of Review

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by said rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. *Floyd v. Worobec*, 248 Neb. 605, 537 N.W.2d 512 (1995).

### (b) Application of Law to Facts

#### (i) Comparable Sales

One of the real estate appraisers called by Westgate testified in Westgate's case in chief that in his opinion the value of the facility before the taking was $945,635 and the value of the property that was taken was $760,175. The claim that the trial court improperly received evidence concerning comparable sales on which Westgate's appraiser relied in formulating those opinions rests on the fact that the trial court permitted the appraiser to testify concerning those sales for the first time during the rebuttal phase of the trial.

The general rule is that rebuttal evidence should be confined to that which explains, disproves, or counteracts evidence introduced by the adverse party. *Cromer v. Farmland Service Coop, Inc.*, 198 Neb. 355, 252 N.W.2d 635 (1977). However, it is within the discretion of the trial court to allow the introduction of evidence in rebuttal which would have been proper evidence upon the case in chief or should have been introduced during the case in chief. *Id.*; *Sacco v. Gau*, 188 Neb. 808, 199 N.W.2d 605 (1972). A judicial abuse of discretion requires that the reasons or rulings of a trial judge be clearly untenable, unfairly depriving a litigant of a substantial

right and a just result. *Adrian v. Adrian*, 249 Neb. 53, 541 N.W.2d 388 (1995).

As the district's appraiser had testified concerning the comparable sale prices he relied upon in formulating his opinion that Westgate's damage by the taking was $190,259, it cannot be said that allowing Westgate's appraiser to testify in rebuttal with regard to the particulars of the comparable sales that formed the basis of his valuation opinion given in Westgate's case in chief constituted an abuse of discretion.

Although the district further asserts that no adequate foundation for the testimony had been laid, we wrote in *Wear v. State of Nebraska*, 215 Neb. 69, 75-76, 337 N.W.2d 708, 713 (1983):

> Generally, evidence as to the sale of comparable property is admissible as evidence of market value, provided there is adequate foundation to show the evidence is material and relevant. The foundation evidence should show the time of the sale, the similarity or dissimilarity of market conditions, the circumstances surrounding the sale, and other relevant factors affecting the market conditions at the time. . . .
>
> Whether properties, the subject of other sales, are sufficiently similar to the property condemned to have some bearing on the value under consideration, and to be of aid to the jury, must necessarily rest largely in the sound discretion of the trial court. The trial court's determination will not be interfered with in the absence of an abuse of discretion. The exact limits, either of similarity or difference, or of nearness or remoteness in point of time, depend upon the location and character of the properties and the circumstances of the case.

Westgate's appraiser testified as to the size of the properties, the time of the transactions, the locations of the properties, the highest and best uses of the properties, and the means by which he confirmed the sale prices. This meets the minimum foundational requirements.

The district also complains, however, that the trial court permitted Westgate during the district's presentation in chief to cross-examine the district's appraiser about the comparable

sales relied upon by Westgate's appraiser, notwithstanding that Westgate's appraiser had not yet testified about those sales.

One of the issues presented in *Janik v. Gatewood*, 233 Neb. 298, 444 N.W.2d 900 (1989), was whether the trial court had improperly limited the plaintiff's cross-examination of the defendant's expert witness, thus preventing the plaintiff from eliciting testimony that would affect the credibility of the witness. We noted that Neb. Evid. R. 611, Neb. Rev. Stat. § 27-611 (Reissue 1995), provides that a judge may, in the exercise of discretion, permit, during cross-examination, inquiry into additional matters as if on direct examination and that cross-examination on matters affecting the credibility of a witness is permitted. We held that

> where testimony is given by a witness on direct examination and that testimony creates an inference favorable to the party producing the witness, anything within the knowledge of that witness tending to rebut the inference is admissible on cross-examination, and the opposing party is entitled to pursue that line of cross-examination as a matter of right.

233 Neb. at 303-04, 444 N.W.2d at 904.

In *Morrison v. Development Co.*, 38 Wyo. 190, 266 P. 117 (1928), the appellant condemnees complained that the trial court erred in permitting cross-examination of their witnesses concerning sales of property of which nothing had been said in their direct examination. The Wyoming Supreme Court noted, however, that the witnesses had testified in the course of their direct examination that there were no sales of other lands in the vicinity of the subject properties and no market value therefor. The court stated that "it was proper that such witnesses should be asked on cross-examination about other sales which had occurred in the neighborhood in order that their knowledge on the subject might be tested." *Id.* at 198, 266 P. at 120.

This holding was refined in *Routh v. State Highway Commission*, 402 P.2d 706 (Wyo. 1965). There, the appellants complained that the trial court erred in restricting their cross-examination as to lands and the valuation thereof in the immediate vicinity or adjacent to lands presented as compara-

bles. The court noted that in the case then before it, the appellants "established no sufficient background for cross-examination by presenting evidence that the property inquired about was similar or comparable to the condemned property," and that, therefore, insufficient foundation had been laid for the interrogation. *Id.* at 709-10. See *Ohio Turnpike Commission v. Fiehler*, 139 N.E.2d 452 (Ohio App. 1955).

Therefore, in a condemnation proceeding, a party may be permitted to cross-examine an expert witness as to comparable sales other than those relied upon by the witness, provided that foundation has been laid that the sales inquired about are, in fact, comparable. Here, at the time the district's appraiser was cross-examined, there had been no foundation laid that the sales used by Westgate's appraiser were comparable. Consequently, it was wrong to permit such questioning.

But not every error justifies a new trial; only an error which is prejudicial to the rights of the unsuccessful party does so; in the absence of such an error, the successful party, having sustained the burden and expense of trial, is entitled to keep the benefit of the verdict. See, *Macholan v. Wynegar*, 245 Neb. 374, 513 N.W.2d 309 (1994); *Wolfe v. Abraham*, 244 Neb. 337, 506 N.W.2d 692 (1993). See, also, *Clouse v. St. Paul Fire and Marine Ins. Co.*, 152 Neb. 230, 40 N.W.2d 820 (1950) (error does not justify new trial unless it disadvantaged complaining party).

In a civil case, the admission or exclusion of evidence which unfairly prejudices a substantial right of the complaining litigant constitutes reversible error. *McDonald v. Miller*, 246 Neb. 144, 518 N.W.2d 80 (1994); *Rosse v. Rosse*, 244 Neb. 967, 510 N.W.2d 73 (1994). Here, the necessary foundation was ultimately laid during Westgate's rebuttal evidence. Thus, the error was not prejudicial.

### (ii) Reproduction Cost

A builder called by Westgate testified that in his opinion the replication cost, or a cost to reproduce the pool facility, was $502,303. In reaching his opinions, the appraiser for Westgate referred to in subpart (i) above relied upon that testimony. The district urges that as the land and the fixtures should have been

valued as a whole rather than separately, neither the opinion of the builder nor those of the appraiser should have been received. In effect, the district argues that such testimony violated the "unit rule" in valuing fixtures.

We agree that there are three generally accepted approaches used for the purpose of valuing real property in eminent domain cases: (1) the market data approach, or comparable sales method, which establishes value on the basis of recent comparable sales of similar properties; (2) the income, or capitalization of income, approach, which establishes value on the basis of what the property is producing or is capable of producing in income; and (3) the replacement or reproduction cost method, which establishes value upon what it would cost to acquire the land and erect equivalent structures, reduced by depreciation. *Ellis v. City of Kansas City*, 225 Kan. 168, 589 P.2d 552 (1979); *Correia v. New Bedford Redevelopment Authority*, 375 Mass. 360, 377 N.E.2d 909 (1978); *Manchester Housing Auth. v. Reingold*, 130 N.H. 598, 547 A.2d 219 (1988); 4 Nichols' The Law of Eminent Domain § 12C.01[3] (rev. 3d ed. 1995). Each of these approaches is but a method of analyzing data to arrive at the fair market value of the real property as a whole. *Correia, supra.*

We also agree that the unit rule is applicable whenever the market data approach is employed, *Ellis, supra*, and that this rule requires that the value of improved property be considered as a whole, without the assignment of separate costs for the land and individual improvements, *Dept. of Transp. v. First Bank*, 260 Ill. App. 3d 490, 631 N.E.2d 1145 (1992). See, *Ellis, supra*; *Milwaukee & Sub. Transp. v. Milwaukee County*, 82 Wis. 2d 420, 263 N.W.2d 503 (1978); *Alaska State Housing Authority v. DuPont*, 439 P.2d 427 (Alaska 1968).

Although we have not heretofore adopted the unit rule by name, we have demonstrated a preference for valuing condemned property as a whole. See, *Y Motel, Inc. v. State*, 193 Neb. 526, 227 N.W.2d 869 (1975) (ordinarily, entire property involved is to be valued and damages to it assessed as a whole); *Medelman v. Stanton-Pilger Drainage Dist.*, 155 Neb. 518, 52 N.W.2d 328 (1952) (when land taken has valuable deposits of minerals, or contains sand, gravel, peat, or other

materials of value, or is covered with growing crops or trees capable of being converted into lumber, circumstances may be considered so far as they affect market value of land, but part of realty cannot be separately valued for its materials as an item additional to value of land for purpose of sale). In addition, our dicta have referred to the unit rule by name. *Pettijohn v. State*, 204 Neb. 271, 281 N.W.2d 901 (1979) (measure of value in suit by lessee for value of improvements sold by lessor not like unit rule in eminent domain proceedings).

However, as Westgate's appraiser used the reproduction cost method in assessing the value of Westgate's property, and as the unit rule is applicable only for the market data approach, the issue is not whether the unit rule was violated, but, rather, whether the appraiser was properly allowed to consider the cost of reproduction in giving his opinion as to the value of Westgate's property.

We have declared that methods of valuation other than the market data approach may be used in certain circumstances. In *Iske v. Metropolitan Utilities Dist.*, 183 Neb. 34, 47, 157 N.W.2d 887, 896 (1968), we held that "capitalization of income of rentals from a reasonably prospective use of the property is an acceptable method of arriving at the value of the property as a factor in the determination of its present market value . . . ." In *First Baptist Church v. State*, 178 Neb. 831, 836-37, 135 N.W.2d 756, 759-60 (1965), we observed in dicta:

> Where there is proof that there is no market value of property with a specialized use, such as a church, convent, hospital, college premises, or the like, the general rule is that resort may be had to some other method of fixing the value of property. . . .
>
> Depending on the nature of the property, the authorities have supported different methods of determining value in these situations. Expert testimony as to reproduction or replacement cost, less depreciation, has been approved in many cases as competent foundation evidence to support an opinion as to valuation.

See, also, *Graceland Park Cemetery Co. v. City of Omaha*, 173 Neb. 608, 114 N.W.2d 29 (1962).

It is generally held, and we agree, that the reproduction cost method as an independent test of value may be used only in rare cases where there is a lack of comparable sales of similar property, where the structures on the property are in some sense unique, or where the character of the improvements is unusually well adapted to the kind of land upon which they exist. *Manchester Housing Auth. v. Reingold*, 130 N.H. 598, 547 A.2d 219 (1988); *Ellis v. City of Kansas City*, 225 Kan. 168, 589 P.2d 552 (1979); *Correia v. New Bedford Redevelopment Authority*, 375 Mass. 360, 377 N.E.2d 909 (1978); *Alaska State Housing Authority, supra*; *State v. Burnett*, 24 N.J. 280, 131 A.2d 765 (1957); *DURA v. Pogzeba*, 38 Colo. App. 168, 558 P.2d 442 (1976).

However, we agree as well with the observation of the New Hampshire Supreme Court in *Manchester Housing Auth.*, 130 N.H. at 602, 547 A.2d at 222, that there is no need

> to adopt a rigid rule limiting the use of reproduction cost evidence to cases involving indisputably "unique" buildings with special characteristics. Rather, where the trial court, in the exercise of its sound discretion, has permitted the jury to consider reproduction cost evidence in an eminent domain proceeding, we will find no error on review if the record documents either (1) the property's uniqueness, or (2) the presence of a number of alternative safeguards—for example, recourse to the reproduction cost method as a last resort, other appraisals, challenges to the evidence on cross-examination, and instructions to the jury on its duty to consider all of the evidence in determining value—that probably minimize the risk of excessive influence on the jury.

See, also, *Correia, supra* (although cognizant that cost reproduction data does not always reflect meaningful measure of value, trial judge should be allowed to exercise discretion in determining when special conditions exist so as to justify use of such data). We thus conclude that it would be imprudent to limit the use of the reproduction cost method in this state only to unique buildings, as improved property may exist in the midst of an expanse of vacant land, resulting in a lack of com-

parable sales which would make the use of the market data approach impossible.

We also agree with the Illinois Supreme Court's view that a finding of uniqueness or special use is proper " 'only when property has special capabilities which make it unmarketable at its true value due to unique improvements * * * .' " *People ex rel. Director of Finance v. YWCA*, 74 Ill. 2d 561, 569, 387 N.E.2d 305, 309-10 (1979). In that case, the condemner sought to condemn land and a building containing a swimming pool, among other things. The court found that the property was not of a special use and that the improvements were not of such a unique nature as to render use of the fair market standard unjust or determination of market value impossible. Here, too, the presence of the swimming facility does not make Westgate's property unique.

However, the lack of uniqueness is not alone determinative of whether use of the reproduction cost method is proper in this case. Westgate's appraiser, in discussing the market data approach, testified:

> Now, in the case of the Westgate pool, it was a major problem because there were no pools for sale, there is not a general market for pools; I could not [go] out and find sales of pools. So in this case, the market approach is not applicable in the sense of finding another pool for sale. There has been one pool sale that I had been aware of and in my opinion, it was not a market sale so there was no way I could use the market approach. So I considered the market approach and could not use it.
>
>  . . . .
>
> I concluded [the income approach] was not appropriate because it's not an income property and it's not — was not built for nor run for income production.

Under that circumstance, the reproduction cost method was an available method to determine value. Thus, it cannot be said the trial court erred in admitting the appraiser's opinion merely because the opinion relied on the reproduction cost method.

The difficulty is that Westgate's appraiser also stated that the highest and best use of the land as vacant was commercial,

and as improved was recreational. In arriving at his opinion as to the value of the property, the appraiser valued it at $3 per square foot as if it were vacant commercial land and then included in his opinion of value the cost of the pool. It is this method to which the district objects.

As stated in 4 Nichols' The Law of Eminent Domain § 12B.11[1] at 12B-83 to 12B-85 (rev. 3d ed. 1995):

> The problem of the appraiser and of the court is to determine the extent to which the value of the land is enhanced (or, conversely, diminished) by the structure upon it. Implicit in the utilization of evidence of reproduction cost is the fact that the structure adds value. . . .
>
> The proper measure of just compensation is market value of the land with the buildings upon it, with the owner receiving nothing for the buildings unless they increase the market value of the land. Accordingly, evidence of the structural value of the buildings is not admissible as an independent test of value. When, however, it is shown that the character of the buildings is well adapted to the location, the structural cost of the buildings, after making proper deductions for depreciation by wear and tear, is a reasonable test of the amount by which the buildings enhance the market value of the property.

The appraiser explained that he valued the land as commercial real estate because "the value of the land as unimproved is developed specifically for the cost approach. And it's saying if we had to replace this facility and buy land to replace it, what would that land be worth? That's the unimproved part." However, that is an incorrect statement regarding the replacement cost approach.

Therefore, an appraiser utilizing the reproduction cost method cannot include as a factor the value of existing improvements, unless the improvements enhance the value of the land. As noted previously, in this case Westgate's appraiser valued the land as commercial real estate, its highest and best use as vacant land. It was therefore erroneous to include the cost of replacing the pool, as this did not enhance the property's value as commercial real estate. The situation would be

otherwise if the highest and best use of the land were recreational, for then the existing improvements would enhance its value.

The question is not what it would cost the condemnee to go out and purchase similar property and construct the same type of improvements on that property; rather, the question is what is the value of the property owned by the condemnee as of the date of the taking. The replacement cost method allows a condemnee, when there are no comparable sales available, to value the land and the improvements separately to arrive at the fair market value so that any enhancement of the value of the land by the improvements will be taken into consideration. But where the highest and best use of the condemnee's land is valued in such a way, i.e., commercial real estate, the value of which is not enhanced by the existing improvements, it is illogical to factor in the replacement costs of the improvements. Since the existing improvements do not enhance the value of the land, the need to value them separately does not exist. See, *Ark. State Highway Comm. v. Richards*, 229 Ark. 783, 318 S.W.2d 605 (1958) (in absence of showing that cost of particular improvement aids in determining market value of whole estate, evidence of cost should be excluded); *Connecticut Printers, Inc. v. Redevelopment Agency*, 159 Conn. 407, 270 A.2d 549 (1970) (general rule is that proper measure of damages is not market value of land plus reproduction cost of improvements, but market value of property as improved, in view of all uses to which it is adaptable and available; structure or improvement may add little or nothing to value unless it is of such character that it is adapted to some prospective use which affects market value of land); *Commonwealth v. Stamper*, 345 S.W.2d 640 (Ky. App. 1961) (improvements should be considered only to extent they enhance value of land to which affixed; if owner builds expensive house on land in slum area, cost of house is not fair test of amount by which house enhances market value of property because, as practical matter, property will not be marketable for sum commensurate with cost of house).

In *Ark. State Hwy. Comm'n v. Toffelmire*, 247 Ark. 74, 444 S.W.2d 241 (1969), three witnesses for the condemnee all testified that the highest and best use of the entire property at

the time of the taking was commercial, yet they all intermingled residential and commercial values. One expert valued the land before the taking as commercial in the amount of $40,964 and the improvements as residential in the amount of $28,153. The Arkansas Supreme Court reversed the jury's award, stating:

> Clearly, in a commercial use evaluation, the value of the improvements, both before and after the taking, should [be] based on commercial worth. Our case of *Arkansas State Highway Comm'n v. Griffin*, 241 Ark. 1033, 411 S.W.2d 495 (1967), sets out the rule. There we said "a verdict rendered by a jury which was partially based on testimony relating to commercial value of the land, and partially based on testimony relating to the land's value for residential purposes, would not be proper . . . ."

247 Ark. at 75, 444 S.W.2d at 241-42.

A similar result was reached in *Matter of Co. of Nassau*, 43 A.D.2d 45, 51, 349 N.Y.S.2d 422, 429 (1973), wherein the court stated:

> By no approach, therefore, can consideration be given to the improvements on the land as an alternative to the highest and best use as vacant land available for residential purposes. Where, as here, the highest and best use is for the land to be employed for a different purpose, no substantial value can be accorded to the improvement which has to be torn down. In *Acme Theatres v. State of New York* (26 N Y 2d 385, 388-389) [258 N.E.2d 912, 914, 310 N.Y.S.2d 496, 499 (1970)], this principle was enunciated as follows: "This is abundantly clear when we consider that in order to achieve a use of the land for purposes other than a drive-in-theatre, it would be necessary to demolish the buildings located thereon, *whose existence is inconsistent with that highest and best use* [emphasis supplied]. It is illogical to award damages for buildings that must be destroyed to achieve the use contemplated in the award of damages for the land."

See, also, *Ark. State Hwy. Comm'n v. Pearrow*, 1 Ark. App. 289, 614 S.W.2d 695 (1981) (judgment reversed where expert

who valued land at $6,400 per acre for commercial purposes also assigned value of $31,040 to condemnees' dwelling which did not contribute to commercial use of property).

As we have determined that it was wrong to allow Westgate's appraiser to testify as to the value of the property including as a factor the cost of reproducing the pool facilities, the question becomes whether this error was prejudicial. Westgate contends that it was not, as the district's appraiser also used the reproduction cost method in arriving at the $190,259 value of the land taken, using comparable sales of commercial real estate. In the opinion of the district's appraiser, the highest and best use of the property was recreational. In order to determine the value of a portion of the land, the district's appraiser used comparison sales with land that had commercial, quasi-commercial, and industrial uses. To that value, and the value of the property in the floodway, he added the value of the improvements.

It is true that normally, an objection to inadmissible evidence is waived if the objecting party later introduces similar evidence. *State v. Lee*, 247 Neb. 83, 525 N.W.2d 179 (1994). However, the rule does not apply where the objecting party introduces similar evidence solely for the purpose of meeting the adversary's case by explaining or rebutting the original evidence. *Id*. The evidence given by Westgate's appraiser and that given by the district's appraiser are not similar, notwithstanding that both used the reproduction cost method and comparable sales of commercial real estate to arrive at the value of the underlying land. The difference between the testimony of Westgate's appraiser and that of the district's appraiser is that while Westgate's appraiser valued the property as commercial and used comparison sales of other nearby commercial properties because of their similarities, the district's appraiser valued the property as recreational and used comparison sales of other properties, not because of their designation as commercial or industrial, but because of their similarities in location, zoning, and proximity to a floodway or flood plain.

The district's appraiser testified: "I searched for any kind of sales that had similarity with the subject; emphasizing again a property with portions in the floodway and floodway fringe

and also zoning. I tried to find as many as I could that had zoning that was similar to the subject." In addition, the expert looked for sales that had similar locations and similar sizes.

In contrast, Westgate's appraiser stated that "we have to evaluate the property as unimproved as part of the assignment. As for the unimproved portion of the assignment, I looked for comparable unimproved sales. The unimproved highest and best use was as commercial, and the comparable sales were commercial and they were largely unimproved." Westgate's appraiser went on to state that he looked for properties that had land in the floodway, in the flood plain, and in a location for similar commercial or potential commercial uses. Of the six comparison sales Westgate's appraiser considered, all had as their highest and best use, in his opinion, commercial use. Indeed, he emphasized the commercial aspects of each comparable sale, i.e., their locations with respect to Interstate 80 or major thoroughfares and their visibility from Interstate 80, in discussing why each sale was a proper comparison. Proximity to and visibility from Interstate 80 do not seem to be factors that would affect the value of property that is used for a recreational use in the way it would affect property that has a commercial use.

What is clearly lacking from the opinion of Westgate's appraiser is some foundation to show that the evidence of comparable sales of commercial real estate is material and relevant to the value of the recreational property, i.e., property with the pool facilities, so that they could be factored into the value of the whole estate. See *Wear v. State of Nebraska*, 215 Neb. 69, 337 N.W.2d 708 (1983) (generally, evidence as to sale of comparable property is admissible as evidence of market value, provided there is adequate foundation to show evidence is material and relevant; foundation evidence should show time of sale, similarity or dissimilarity of market conditions, circumstances surrounding sale, and other relevant factors affecting market conditions at time). It was therefore error to receive the testimony of Westgate's appraiser.

While the amount of the verdict falls within the various value opinions, it is impossible to determine what effect the opinion of Westgate's appraiser had on the verdict. Where it

does not appear from the record that evidence wrongfully admitted in a jury trial did not affect the result of the trial unfavorably to the party against whom it was admitted, its reception must be considered prejudicial error. *Singles v. Union P. R.R. Co.*, 174 Neb. 816, 119 N.W.2d 680 (1963); *Fries v. Goldsby*, 163 Neb. 424, 80 N.W.2d 171 (1956); *Lane v. Burt County Rural Public Power Dist.*, 163 Neb. 1, 77 N.W.2d 773 (1956).

Thus, the district was unfairly prejudiced by the opinion of Westgate's appraiser based on both the value of the land as commercial real estate and the value of the pool facility.

### (iii) Repair Costs

While that determination in and of itself requires that this cause be remanded for a new trial, we consider the remaining claims of evidential error, as the issues are likely to arise again in the course of that proceeding.

The district challenges as well the trial court's receipt of evidence concerning the cost of repairs made to Westgate's improvements prior to the date of the taking. Westgate's president was allowed to testify as to an amount spent on pool repairs from 1982 to 1990. In addition, evidence of expenditures for materials for repairs accomplished from 1981 to the date of the taking was received.

Cost of repair is not synonymous with market value. See *Kinter v. United States*, 156 F.2d 5 (3d Cir. 1946). We held in *First Baptist Church v. State*, 178 Neb. 831, 135 N.W.2d 756 (1965), that testimony as to the cost of remodeling the subject property 8 to 14 years previously was not competent evidence of market valuation because it was not relevant and was too remote in point of time.

Indeed, Westgate concedes that the cost of past repairs provides no evidence of the value of the property, but urges that in this case the evidence was admissible, as it rebutted the testimony of the district's appraiser that the pool facilities were half depreciated. The difficulty with this contention is that a review of the record reveals that Westgate adduced this evidence before the district's appraiser testified.

Thus, the evidence was inadmissible; again, as it cannot be determined how the improperly admitted evidence influenced the jury, its receipt must be considered prejudicial error.

### (iv) Summary Documents

The district also contends that the trial court erred in receiving into evidence exhibits consisting of written summaries of the testimony given by the two appraisers called by Westgate.

One of the questioned exhibits is a one-page summary of Westgate's appraiser testifying as outlined in subparts (i) and (ii) above. The summary details this appraiser's opinion as to value in terms of the pool facilities and the land, the value of the remainder both before and after the taking, the damages to the remainder, and the total taking damages. The other questioned exhibit is a single-page cover letter from the other Westgate appraiser to Westgate's counsel, which summarizes the opinions that the appraiser expressed at trial as to the value of the property before the taking, the value of the part taken, the value of the remainder before the taking, the value of the remainder after the taking, the damages to the remainder, and the total compensation due Westgate.

The district urges that the summaries constituted inadmissible and prejudicial hearsay.

Neb. Evid. R. 801, Neb. Rev. Stat. § 27-801(3) (Reissue 1995), defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." While the statements contained in the written summaries substantially duplicated certain of the oral testimony given at trial by Westgate's appraisers, it cannot be said that the statements contained in the summaries were themselves made at trial. Inasmuch as the statements contained in the summaries were offered to prove the truth of the matters asserted therein, the summaries constituted hearsay and were improperly admitted. See, *Howells Elevator v. Stanco Farm Supply Co.*, 235 Neb. 456, 455 N.W.2d 777 (1990) (written estimate of repair damage was hearsay); *Belitz v. Suhr*, 208 Neb. 280, 303 N.W.2d

284 (1981) (statements of third parties in officer's report hearsay).

As explained by the Virginia Supreme Court, the admission of evidence of this type is prejudicially erroneous because during its deliberations, the jury might place more weight on written summaries than on its collective recollection of the actual testimony. *Norfolk and Western Ry. Co. v. Puryear*, 250 Va. 559, 463 S.E.2d 442 (1995). Accord *Dept. of Transp. v. Benton*, 214 Ga. App. 221, 447 S.E.2d 159 (1994).

### (c) Resolution

Because of the foregoing evidential errors, the second assignment of error is meritorious.

### IV. JUDGMENT

For the foregoing reasons, the judgment of the trial court is, as first noted in part I, reversed and the cause remanded for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.