756 N.W.2d 290 (2008)
17 Neb. App. 17
William E. MORGAN, Jr., a minor, by and through his parent and next friend, William E. Morgan, Sr., and William E. Morgan, Sr., individually, appellants,
v.
Mohan MYSORE, M.D., and Children's Memorial Hospital, a Nebraska corporation, appellees.
No. A-06-1326.
Court of Appeals of Nebraska.
September 2, 2008.
*293 Joseph B. Muller, of Law Offices of Ronald J. Palagi, P.C., L.L.O., Omaha, for appellants.
Patrick G. Vipond and Denise M. Destache, of Lamson, Dugan & Murray, L.L.P., Omaha, for appellees.
INBODY, Chief Judge, and IRWIN and CARLSON, Judges.
CARLSON, Judge.

INTRODUCTION
William E. Morgan, Sr., individually and as the parent and next friend of William E. Morgan, Jr. (Billy), brought a medical malpractice action against Mohan Mysore, M.D., and Children's Memorial Hospital (CMH) arising out of the care and treatment Billy received during his hospitalization at CMH on and after July 5, 2002. A jury returned a verdict in favor of Mysore and CMH. Based on the analysis that follows, we affirm.

BACKGROUND
On July 5, 2002, Billy, who was 17 years of age at the time, was admitted to the intensive care unit at CMH at around 10 a.m. Billy had been transferred to CMH from the emergency department of another hospital where he was seen earlier that morning for vomiting and decreased level of consciousness. Billy's blood glucose level in the emergency room was over 1,400, with the normal range being 70 to 110. Billy had been an insulin-dependent diabetic since age 7. He had previously been hospitalized twice as a result of his diabetes, once at the time of diagnosis and once several years before his admission to CMH for reeducation.
Mysore was the doctor or intensivist on duty in the intensive care unit at CMH when Billy was admitted, and he assumed responsibility for Billy's care. After examining Billy, Mysore concluded that Billy was suffering from diabetic ketoacidosis (DKA) and began treating him for his symptoms. DKA is a potentially life-threatening complication of insulin-dependent diabetes where the person becomes progressively dehydrated, has low insulin levels, and develops high blood glucose levels. DKA can affect multiple organs of the body. Mysore attributed the cause of Billy's DKA to Billy's noncompliance with his insulin regimen. There are three other recognized causes of DKA in diabetics in addition to poor insulin management, one of which is infection.
As the day progressed, Billy's glucose levels decreased, indicating that the DKA was being appropriately treated. At around 8 p.m., Billy's nurse noted that Billy appeared to be weak in his lower extremities. At around 10 p.m., the nurse noted that she could not detect any movement in Billy's lower extremities. The nurse's notes indicate that she reported her finding to Mysore and a resident physician working with Mysore, who then examined Billy. At 10 p.m., Billy's condition significantly deteriorated. His mental condition was such that he was unable to communicate and unable to cooperate with an examination. His heart rate increased, his blood pressure decreased, and he developed a high fever. He also had massive abdominal distension. Mysore and the *294 staff at CMH spent the next several hours trying to stabilize Billy's critical condition.
By 6 a.m. on July 6, 2002, Billy's mental alertness had improved. He was able to follow commands and cooperate with those examining him. It was confirmed at that time that Billy had lost movement and sensation in his lower extremities. A pediatric neurology consult was obtained and MRI's of his brain and spine were performed, at which time it was discovered that a spinal epidural abscess was compressing the spinal cord. A spinal epidural abscess is an infectious process that occurs in and around the spinal column. Billy was taken to surgery later that day for spinal cord exploration and decompression. However, Billy has never regained use of his legs and is paralyzed from the chest down.
On November 8, 2002, Morgan filed an action against Mysore and CMH (collectively appellees) alleging that they were "negligent in failing to follow standard protocol, policies and procedures for assessment and treatment of Billy's condition." In January 2003, Morgan served interrogatories and requests for production of documents on appellees. In February, appellees provided Morgan with answers to interrogatories and responses to requests for production of documents. Morgan's counsel took Mysore's deposition on April 7, 2003. In December 2003 or January 2004, Mysore prepared a narrative summary of the events that transpired on July 5 and 6, 2002.
In February 2005, Morgan requested copies of all documents reviewed by appellees' experts. A few days later, appellees notified Morgan that they would send copies of the documents reviewed by their experts. Subsequently, the issue was addressed by letters between the parties dated March 16, 2005, July 6, 2005, August 24, 2005, and September 27, 2005. On October 3, in anticipation of Morgan's taking the deposition of one of appellees' expert witnesses, appellees provided Morgan with a list of documents the expert reviewed. The list included "Narrative of Dr. Mysore." On October 24, Morgan requested copies of documents reviewed by appellees' experts that had not yet been turned over to Morgan, including Mysore's narrative. On November 4, Morgan received a copy of Mysore's narrative. At no time did appellees provide any supplemental responses to Morgan's original request for production of documents, nor did they provide any supplemental responses to Morgan's interrogatories.
On November 10, 2005, Morgan filed a motion for sanctions alleging that Mysore's narrative contained information that was inconsistent with that contained in CMH's medical records and Mysore's deposition testimony. The motion alleged that as a result of the inconsistent information in Mysore's narrative, Morgan may need to provide the narrative to his experts to see if it changes the experts' opinions, redepose Mysore regarding the narrative, and depose additional witnesses. The motion stated that the above actions would not be necessary but for appellees' failure to timely comply with Morgan's requests for documents, including Mysore's narrative, and appellees' failure to supplement their responses to Morgan's discovery requests, which the motion alleged are violations of Nebraska's discovery rules. See Neb. Ct. R. Disc. § 6-326(e)(2)(B). Following a hearing on Morgan's motion for sanctions, the court overruled the motion, finding that Mysore did not change his testimony in his narrative, but, rather, explained his actions, which were not asked for by Morgan's counsel at Mysore's deposition. Morgan filed a motion to continue the trial date to allow him time to conduct *295 further discovery. The trial court granted the motion.
Appellees filed a motion to limit further discovery, and a hearing was held on the motion. Following the hearing, the trial court entered an order setting forth specific restrictions and deadlines for additional discovery. The order allowed Morgan to redepose Mysore and allowed Morgan to submit the narrative and redeposition to his experts to supplement their opinions in response to additional information obtained through Mysore's narrative, redeposition, and other additional discovery. The order also allowed Morgan to designate additional fact witnesses.
Another hearing was subsequently held pursuant to a motion by appellees to limit the scope of Mysore's second deposition. Morgan presented a list of 10 areas he wanted to explore during Mysore's second deposition. The trial court denied some of the requested areas of inquiry and allowed others. The second deposition of Mysore was taken on April 6, 2006.
Trial was held from July 12 to 24, 2006. Morgan tried to prove that appellees were negligent in failing to timely diagnose and treat Billy's spinal epidural abscess, which led to paralysis in Billy's lower extremities. Appellees tried to show that Billy was irreversibly paralyzed by 10 p.m. on July 5, 2002, giving them only 12 hours to diagnose and treat a rare condition, when Billy's signs and symptoms were reasonably explained by his DKA. Appellees contended that during these 12 hours, Billy was critically ill and medically unstable and appellees were trying to stabilize Billy's condition and save his life. Following trial, the jury returned a verdict in favor of appellees.

ASSIGNMENTS OF ERROR
Morgan assigns, restated, that the trial court erred in (1) failing to apply and enforce the Nebraska discovery rules, (2) failing to instruct the jury that portions of Mysore's testimony should be disregarded as a matter of law, (3) failing to give two other jury instructions that Morgan proffered, and (4) not allowing him to present rebuttal evidence.

STANDARD OF REVIEW
Generally, the control of discovery is a matter for judicial discretion. Gallner v. Hoffman, 264 Neb. 995, 653 N.W.2d 838 (2002); State ex rel. Acme Rug Cleaner v. Likes, 256 Neb. 34, 588 N.W.2d 783 (1999).
To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction. Higginbotham v. Sukup, 15 Neb.App. 821, 737 N.W.2d 910 (2007).
It is within the trial court's discretion whether to allow rebuttal evidence. See Westgate Rec. Assn. v. Papio-Missouri River NRD, 250 Neb. 10, 547 N.W.2d 484 (1996). A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and a just result. Id.

ANALYSIS

Trial Court's Rulings Regarding Discovery.
Morgan first argues that the trial court failed to apply and enforce the discovery rules, thereby denying Morgan a fair trial. Morgan alleges that the trial court abused its discretion by overruling the motion for sanctions and in limiting *296 further discovery when appellees failed to comply with the rules of discovery by not disclosing the narrative earlier than they did.
Morgan contends that throughout the discovery process, Morgan requested information from appellees regarding the medical records; copies of all records prepared by appellees, including Mysore; and all documents provided to their experts. Morgan further contends that after all discovery had been completed, and only 3 weeks before the case was to go to trial, appellees provided Morgan with a copy of Mysore's narrative. Morgan contends that appellees' failure to disclose the narrative and provide him with a copy at an earlier date was a violation of appellees' duty to supplement their discovery responses pursuant to § 6-326(e)(2)(B) and a violation of § 6-326(b)(4)(A)(i), which requires a party to divulge the facts upon which an expert is expected to testify and the grounds for his opinions. Based on appellees' actions during the discovery process, Morgan argues that the trial court should have granted the motion for sanctions and should not have limited further discovery, specifically Mysore's second deposition, to the extent it did.
Although the trial court overruled Morgan's motion for sanctions, the trial court subsequently granted Morgan's motion for a continuance, allowing Morgan additional time to conduct discovery. The trial court allowed Morgan to redepose Mysore, which he did; allowed Morgan to submit Mysore's narrative and redeposition to Morgan's experts for review and analysis; and allowed him to designate additional factual witnesses. Therefore, Morgan was able to question Mysore about alleged inconsistencies in his narrative and submit this information to his experts to see if it changed their opinions. In addition, the fact that the narrative existed had been disclosed to Morgan prior to Morgan's taking the depositions of appellees' expert witnesses in a list setting forth the material that the experts had reviewed.
In regard to the court's limits on further discovery, the trial court did not allow Morgan to explore all the areas he requested in his redeposing of Mysore, but it did grant some of his requests. The court's order discussed each area requested by Morgan and explained why it was or was not allowing Morgan to explore each area. One of the main areas of alleged inconsistency in Mysore's narrative was Mysore's account of his actions between 8 and 10 p.m. on July 5, 2002. The court allowed Morgan to explore this area, specifically ordering that Morgan "may inquire of ... Mysore as to what [he] was told by the nurse(s) at 8:00 p.m. on July 5, 2002, and what his activities were and where he was from that time until approximately 2:00 a.m. July 6, 2002." Assuming without deciding that appellees violated the discovery rules, Morgan was able to prepare for trial without surprise. He was allowed to clear up inconsistencies before trial, and he was allowed time before trial to find out if any of his experts' opinions changed as a result of the information in Mysore's narrative. Morgan suffered no prejudice as a result of the court's rulings. Generally, the control of discovery is a matter for judicial discretion. Gallner v. Hoffman, 264 Neb. 995, 653 N.W.2d 838 (2002); State ex rel. Acme Rug Cleaner v. Likes, 256 Neb. 34, 588 N.W.2d 783 (1999). We determine that the trial court did not abuse its discretion in overruling Morgan's motion for sanctions or in the limits it placed on further discovery.

Momsen Instruction.
As previously discussed, Morgan contends that Mysore's narrative contains testimony that is inconsistent with that given in his initial deposition. He therefore argues *297 that the trial court erred in failing to instruct the jury that parts of Mysore's testimony were discredited as a matter of law. Specifically, Morgan contends that any information within the narrative that relates to the timeframe between 8 and 10 p.m. was a significant, material change from Mysore's deposition. Morgan proposed such an instruction to the trial court, which provided:
The Court has determined that ... Mysore's testimony regarding whether he was notified by [the nurse] of the change in [Billy's] neurological status at 8:00 p.m., and whether he was in [Billy's] room between 8:00 p.m. and 10:00 p.m., is discredited as a matter of law.
Therefore, you must accept as true... Mysore's original deposition testimony that he does not recall whether the [n]urse told him about her finding, at 8:00 p.m., that Billy ... had leg weakness, and that [Billy's] temperature had gone up. You must also accept as true... Mysore's original deposition testimony that he did not see Billy ... at 8:00 p.m., and that he did not see Billy... until called into the room at 10:00 p.m.
The trial court refused to give the instruction.
Morgan relies on Momsen v. Nebraska Methodist Hospital, 210 Neb. 45, 313 N.W.2d 208 (1981), which held that where a party, without reasonable explanation, changes his testimony concerning the material facts on a vital issue, such change clearly being made to meet the exigencies of pending litigation, the testimony is discredited as a matter of law and should be disregarded. In Momsen, the change in testimony occurred during the time between a defendant's deposition and his testimony at trial, which were obviously both done under oath. In the present case, Mysore's narrative was not given under oath and does not constitute testimony. Momsen is clear that the doctrine applies when there are two versions of the pertinent story told under oath. That is not the case here. As a result, Momsen is inapplicable to the facts of this case and the trial court did not err in refusing to give a Momsen instruction.

Other Jury Instructions.
Morgan also assigns that the trial court erred in failing to give two other jury instructions that he proffered. The first jury instruction Morgan proposed that the trial court refused to give explained the concept of a reliable "differential diagnosis." Morgan contends that the jury was presented with testimony regarding the concept of differential diagnosis and with whether Mysore conducted a proper differential diagnosis when treating Billy. Morgan's proposed instruction cites Epp v. Lauby, 271 Neb. 640, 715 N.W.2d 501 (2006), and Carlson v. Okerstrom, 267 Neb. 397, 675 N.W.2d 89 (2004), as the sources of his instruction. These cases involved a Daubert hearing that took place before trial to determine whether a medical expert's opinion regarding the cause of a party's condition or injuries was relevant and reliable and thus, admissible. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Under the Daubert framework, for an expert's opinion to be admissible, the expert must have conducted a reliable differential diagnosis, which involves compiling a list of potential causes of a patient's symptoms and then eliminating potential causes based on a continuing examination of the evidence to reach the most likely cause of the patient's condition. Morgan's instruction sets forth how a differential diagnosis must be conducted to be considered reliable for purposes of a Daubert hearing. The instant case does *298 not involve a Daubert analysis, and therefore, the instruction relates to a differential diagnosis process that is not relevant to this case. We conclude that the instruction proposed by Morgan is inapplicable and that the trial court did not err in refusing to give such instruction.
The second instruction Morgan contends the trial court erred in failing to give is a nondelegable duty instruction, which stated in part:
An intensivist, working in a pediatric intensive care unit, has the duty to be aware of all reasonably available medical information significant to the health of his patient during the time that he is providing medical care to his patient. This is a non-delegable duty. That means that the intensivist, by assigning to another the duty to read such medical information, is not relieved from liability arising from this duty if it is negligently performed.
No one disputes that Mysore was the doctor or intensivist in charge of Billy's care on July 5, 2002. Based on the record before us, Morgan did not present evidence that Mysore delegated or assigned duties in regard to Billy's available medical information and appellees did not contend that Mysore was not required to be aware of all the medical information. We conclude that the tendered instruction was not warranted by the evidence and that the trial court did not err in failing to give Morgan's nondelegable duty instruction.

Rebuttal Evidence.
Finally, Morgan contends that the trial court erred in not allowing him to present rebuttal evidence. Morgan sought to offer the testimony of Dr. Theresa Hatcher on rebuttal. Appellees objected on the basis of improper rebuttal evidence, and the trial court sustained the objection. Hatcher stated, in an offer of proof, that she had reviewed two entries in CMH's medical records written by a pediatric surgeon who examined Billy around 11 or 11:30 p.m. on July 5, 2002. According to Hatcher, the pediatric surgeon's notes indicate that he performed a rectal examination on Billy and the result was normal. If allowed to testify, Hatcher would have stated that she would not expect a patient with paralysis below his diaphragm to have a rectal examination with normal results and that she would be able to note the paralysis upon doing the rectal examination.
Morgan contends that the time that Morgan became paralyzed was an important issue in this case and that Hatcher's testimony would have proved that Morgan's paralysis had not occurred by 10 p.m. on July 5, 2002, as appellees tried to prove in their case in chief. Morgan also believes that the testimony of Hatcher should have been allowed to refute Mysore's testimony that he did not know whether the result of a rectal examination of Billy in his current state of paralysis would be abnormal.
The general rule is that rebuttal evidence should be confined to that which explains, disproves, or counteracts evidence introduced by the adverse party; it is within the discretion of the trial court to allow the introduction of evidence in rebuttal which would have been proper evidence upon the case in chief or should have been introduced during the case in chief. Westgate Rec. Assn. v. Papio-Missouri River NRD, 250 Neb. 10, 547 N.W.2d 484 (1996).
Hatcher's testimony does not explain, disprove, or counteract evidence introduced by appellees. Appellees did not introduce evidence regarding the significance of a rectal examination in a patient such as Billy. The result of the rectal examination performed by the pediatric *299 surgeon was not evidence introduced by appellees. The pediatric surgeon's notes from his examination of Billy were part of Billy's medical records from CMH, which Morgan had before trial. If Morgan wanted to point out that a rectal examination with normal results in a patient indicates no paralysis, he could have called Hatcher for that very reason in his case in chief.
Further, Mysore's testimony that he did not know whether a rectal examination of Billy in his current state of paralysis would be abnormal was not introduced by appellees  rather, it was brought out by Morgan on cross-examination of Mysore.
Hatcher's testimony would have been proper evidence for Morgan's case in chief because it related directly to Morgan's principal allegation that the failure of appellees to timely diagnose and treat a spinal epidural abscess in Billy caused him to suffer permanent paralysis. Thus, Morgan sought to adduce evidence on rebuttal that simply reinforced the theory of the case he advanced in his case in chief. It is within the discretion of the trial court to allow the introduction of evidence in rebuttal which would have been proper evidence upon the case in chief or should have been introduced during the case in chief. Westgate Rec. Assn., supra. We conclude that the trial court did not abuse its discretion in not allowing Hatcher's testimony to be used as rebuttal evidence. This assignment of error is without merit.

CONCLUSION
For the foregoing reasons, we find no error in the proceedings before the district court and therefore affirm its judgment in favor of appellees.
AFFIRMED.