Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/30/2018 08:15 AM CDT

FRANCISCA RODRIGUEZ, AN INDIVIDUAL, APPELLANT, V.
SURGICAL ASSOCIATES P.C. AND GREG FITZKE, M.D.,
AN INDIVIDUAL, APPELLEES.

___ N.W.2d ___

Filed January 5, 2018.    No. S-16-698.

1. **Jury Instructions.** Whether a jury instruction is correct is a question
   of law.
2. **Judgments: Appeal and Error.** When reviewing questions of law, an
   appellate court has an obligation to resolve the questions independently
   of the conclusion reached by the trial court.
3. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules
   apply, the admissibility of evidence is controlled by such rules; judicial
   discretion is involved only when the rules make discretion a factor in
   determining admissibility.
4. **Trial: Evidence: Appeal and Error.** A trial court has the discretion to
   determine the relevancy and admissibility of evidence, and such deter-
   minations will not be disturbed on appeal unless they constitute an abuse
   of that discretion.
5. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the
   reasons or rulings of a trial judge are clearly untenable, unfairly depriv-
   ing a litigant of a substantial right and denying just results in matters
   submitted for disposition.
6. **Jury Instructions: Pleadings: Evidence.** A litigant is entitled to have
   the jury instructed upon only those theories of the case which are pre-
   sented by the pleadings and which are supported by competent evidence.
7. **Jury Instructions: Proof: Appeal and Error.** To establish reversible
   error from a court's failure to give a requested jury instruction, an appel-
   lant has the burden to show that (1) the tendered instruction is a correct
   statement of the law, (2) the tendered instruction was warranted by the
   evidence, and (3) the appellant was prejudiced by the court's failure to
   give the requested instruction.
8. **Negligence: Liability: Contractors and Subcontractors.** Generally,
   one who employs an independent contractor is not vicariously liable for

physical harm caused to another by the acts or omissions of the contractor or its servants. An employer's liability for the breach of a nondelegable duty, however, is an exception to this general rule.

9. **Negligence: Liability: Contractors and Subcontractors: Words and Phrases.** A nondelegable duty means that an employer of an independent contractor, by assigning work consequent to a duty, is not relieved from liability arising from the delegated duties negligently performed.

10. **Negligence: Liability.** As a result of a nondelegable duty, the responsibility or ultimate liability for proper performance of a duty cannot be delegated, although actual performance of the task required by a nondelegable duty may be done by another.

11. **Negligence: Jury Instructions.** A nondelegable duty instruction is not appropriate when there are no judicial admissions or evidence that a defendant had assigned the performance of his duties to a subordinate party at the time that the alleged breach occurred.

12. **Jury Instructions: Damages: Proximate Cause: Proof.** A preexisting condition jury instruction does not permit a jury to assess damages in any amount unless the plaintiff first proves proximate cause.

13. **Juries: Verdicts: Presumptions.** When the jury returns a general verdict for one party, an appellate court presumes that the jury found for the successful party on all issues raised by that party and presented to the jury.

14. **Appeal and Error.** The purpose of an appellant's reply brief is to respond to the arguments the appellee has advanced against the errors assigned in the appellant's initial brief.

15. **Records: Appeal and Error.** It is incumbent upon the appellant to present a record supporting the errors assigned; absent such a record, an appellate court will affirm the lower court's decision regarding those errors.

16. **Rules of Evidence: Expert Witnesses: Hearsay.** Under Neb. Evid. R. 703, Neb. Rev. Stat. § 27-703 (Reissue 2016), an expert may rely on hearsay facts or data reasonably relied upon by experts in that field.

17. **Expert Witnesses: Physicians and Surgeons: Records.** A medical expert may express opinion testimony in medical matters based, in part, on reports of others which are not in evidence but upon which the expert customarily relies in the practice of his or her profession.

18. **Expert Witnesses: Records: Hearsay: Testimony.** The mere fact that an expert relied on hearsay does not transform it from inadmissible into admissible evidence. However, inadmissible evidence, upon which an expert relies, may be admitted on direct examination if it was offered not to prove the truth of the matter asserted but simply to demonstrate the basis for the expert's testimony.

Appeal from the District Court for Lancaster County: Lori A. Maret, Judge. Affirmed.

Steven H. Howard, of Dowd, Howard & Corrigan, L.L.C., for appellant.

James A. Snowden and Elizabeth Ryan Cano, of Wolfe, Snowden, Hurd, Luers & Ahl, L.L.P., for appellees.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Funke, J.

This appeal arises from an order entered on a general jury verdict for Greg Fitzke, M.D., and Surgical Associates P.C. (collectively appellees) in a medical negligence claim. Francisca Rodriguez claimed that Fitzke was negligent in failing to timely diagnose and treat her, which resulted in her suffering additional injuries.

Rodriguez claims that the court committed reversible error in denying certain jury instructions and allowing witnesses to provide expert opinions that were not disclosed before trial. Because we do not find merit in Rodriguez' claims, we affirm.

## I. BACKGROUND

### 1. Factual Background of Rodriguez' Hospitalization and Treatment

On April 16, 2012, Rodriguez was referred to a hospital in Lincoln, Nebraska, due to stomach pains, fever, and nausea.

Fitzke is a general surgeon and a partner in Surgical Associates who has surgical privileges at the hospital. Upon examining Rodriguez, Fitzke determined that she needed an immediate cholecystectomy, a surgical procedure to remove her gallbladder. Rodriguez' gallbladder was gangrenous and had attached to other organs around it.

While her gallbladder was being removed, it ruptured and released stones and purulent material, or pus, into Rodriguez' abdominal cavity—an unavoidable risk of the surgery. Fitzke

cleaned the abdomen and inserted a drain in Rodriguez' hepatic fossa to allow any accumulation of tissue fluids from the procedure to drain out of the body and be monitored. During or as a result of the surgery, however, Rodriguez' intestine was also perforated, a fact not known by Fitzke at the time.

Later that evening, Rodriguez appeared to be recovering well with only minor pain from the surgery. On April 17, 2012, Rodriguez began experiencing significant pain and her status changed from outpatient to inpatient. Fitzke and Raymond Taddeucci, M.D., another partner with Surgical Associates, testified that her condition was consistent with the extent of her acute cholecystitis and the known complications of the surgery.

Rodriguez' vital signs were relatively stable on April 17, 2012. But, around 11 p.m., Rodriguez' blood pressure became hypotensive, nearly to the point of being classified as shock, and her heart rate increased into tachycardia. At both 3 and 4 a.m., on April 18, Rodriguez' vitals again exhibited significant hypotension, meeting the criteria for shock, and tachycardia. Additionally, she had an elevated respiratory rate, tachypnea; elevated white blood cell count; and decreased oxygen saturation level and urinary output. She was also reported to be confused.

The surgeon on call for Surgical Associates ordered Rodriguez transferred to the intensive care unit and engaged internal medicine services for further treatment and evaluation. She also received a broad-spectrum antibiotic, in addition to the antibiotic that she was given shortly after surgery; intravenous fluids; and oxygen.

A physician's assistant stated in a 4 a.m. progress note that Rodriguez had diffuse tenderness in her abdomen. He also stated the following as potential causes for many of Rodriguez' symptoms: dehydration, blood pressure medications, and early mild sepsis—potentially resulting from the gallbladder material that spilled into her abdomen during surgery or a developing pneumonia. At about 7 a.m., an internal

medicine doctor ordered a CT scan with unspecified contrast of Rodriguez' abdomen because of her pain and hypotension. X rays performed that morning showed that there was free air in Rodriguez' abdomen, which was expected after the procedure, and new developing lobe infiltrates in the left lower lung, which suggested the development of pneumonia.

At about 8 a.m., Fitzke examined Rodriguez and reviewed her laboratory tests. He noted that her abdomen was soft, tender, and distended but that there were no signs of peritonitis. He decided not to perform exploratory surgery, and he canceled the order for a CT scan. He testified that administering intravenous fluids or oral contrast for the CT scan would have been risky because of Rodriguez' decreasing kidney function and developing pneumonia and that the CT scan was unlikely to produce useful information, based on both his physical examination of her and the proximity to surgery. Instead, he decided to continue treating Rodriguez with additional intravenous fluids and antibiotics. He stated that he discussed canceling the CT scan with the internist on duty later that morning.

Throughout the day, test results indicated that Rodriguez' condition was declining into severe sepsis. She continued to experience hypotension, tachycardia, confusion, both an elevated respiratory rate and white blood cell count, and both decreased oxygen saturation levels and urinary output. Rodriguez was also diagnosed with renal failure and exhibited results indicating that she might be suffering organ failure in her heart, brain, and liver.

Between 2 and 3 a.m., on April 19, 2012, the nurses called an internal medicine doctor because Rodriguez was in shock. The doctor placed a central venous catheter into a large vein going down toward Rodriguez' heart. In addition, he gave Rodriguez two vasopressor drugs designed to elevate the blood pressure to a safe level.

The doctor also ordered a "HIDA" scan, which tests whether the liver and biliary system are functioning normally, because bile-tinged fluids were beginning to exit from the drain in

Rodriguez' hepatic fossa. The results of the HIDA scan showed that fluid was passing from the liver to the intestine, ruling out cholangitis. However, it was otherwise equivocal regarding a leak from the biliary system, which would be treated by a non-surgical procedure, and an intestinal leak, which is a surgical emergency requiring intervention.

When Rodriguez was returned to the intensive care unit at about 12:20 p.m., she again went into shock. Rodriguez was placed on heavy sedation, to allow an endotracheal tube to be inserted directly into the lungs, and placed on a ventilator to help oxygenate her tissues. She was administered 80 percent oxygen, which meant she was going rapidly into overt respiratory failure and clear septic shock. Beginning on the evening of April 18 and throughout April 19, 2012, the nurses also reported several times that Rodriguez' abdomen was distended.

Despite the deterioration in her condition, Rodriguez experienced slight improvement in some of her test results. Many of her issues from the previous day, however, persisted. At 12:20 p.m., Robin Allen, M.D., an internist, stated at the conclusion of her progress report: "? Need to go back to OR."

At about 1:15 p.m., Fitzke examined Rodriguez. He stated in his progress report that her abdomen was not rigid or distended. He also indicated that she might have delayed sepsis from the gross purulence released during her surgery but that there were no signs of ascending cholangitis. Further, he wrote that a CT would still be "of low yield" for identifying a bile leak. He concluded that he would follow Rodriguez' progress and that the sepsis protocol should continue to be followed.

Fitzke testified that his primary consideration at that time was that Rodriguez had sepsis, resulting from the ruptured gallbladder, and that his secondary concern was a bile duct leak. He did not consider an intestinal perforation to be existent because she was not exhibiting peritonitis or succus entericus in her drain; while Rodriguez was not necessarily getting better, factors indicated a positive response to therapy

and a potential for improvement. He discussed the factors present with Allen, another treating physician, and believed that she agreed he did not need to return Rodriguez to the operating room.

At 5 p.m. on April 19, 2012, Fitzke transferred care of Rodriguez to Taddeucci, because Fitzke had to be out of town for a medical meeting the following day. Taddeucci testified that he and Fitzke discussed Rodriguez' condition; Fitzke was not sure what was causing Rodriguez' issues, but they discussed ascending cholangitis, pneumonia, and a bile leak as potential causes.

That evening, John Duch, M.D., a nephrologist, noted that Rodriguez' abdomen was soft but distended with diminishing bowel sounds. He also wrote: "Septic shock. She is on broad-spectrum antibiotics and empiric vasoactive medications, and surgery is following." Additionally, Rodriguez began presenting a fever for the first time since her operation, and her urine output decreased again.

By the morning of April 20, 2012, the other improvements from April 19 had also reversed. Taddeucci examined Rodriguez at about 12:30 p.m. and stated that she was now experiencing peritonitis. Further, the pulmonologist and critical care doctor informed Taddeucci that they had done everything they could but that her condition was not improving. Taddeucci determined that a second surgery would be necessary to address her condition, which he performed at around 2:30 p.m.

The surgery started as an exploratory laparoscopic procedure, intended to discover possible explanations for Rodriguez' decline. During this surgery, however, Taddeucci discovered the perforation in Rodriguez' small intestine. At that point, the nature of the surgery changed to an anastomosis procedure, which is an operation to remove a section of the intestine. Taddeucci also extracted about two quarts of bilious fluid, which had leaked from the intestine into Rodriguez' abdominal cavity. Rodriguez tolerated the procedure well, and there were no complications.

Ultimately, Rodriguez had eight additional operations during the subsequent 1½ months and remained hospitalized until July, with numerous complications. She had her final operation in February 2013, which was a skin graft to heal a large open wound on her abdomen that had persisted since her release. Rodriguez ultimately recovered with no permanent organ injuries.

## 2. Expert Opinions

At trial, Rodriguez called one surgical expert and one critical care physician. Each testified regarding his opinion of the care Fitzke provided to Rodriguez.

The surgical expert testified that Fitzke breached the standard of care in three instances: (1) by failing to follow the three-step protocol for treating septic shock, (2) by failing to create and follow a reasonable surgical differential diagnosis, and (3) by canceling the CT scan that had been ordered for Rodriguez on April 18, 2012. The critical care physician also testified that Fitzke's canceling the CT scan and failing to timely treat the source of Rodriguez' infections were a breach of the standard of care. As a result of these breaches, each testified that Rodriguez' corrective surgery was delayed by 2 days, occurring on April 20 instead of April 18. The critical care physician also provided testimony concerning the injuries that resulted from the delay.

Appellees called two expert surgical witnesses. They testified that canceling the CT scan was reasonable based on the circumstances. Additionally, they stated that Fitzke had complied with all reasonable standards of care during the postoperation period and that Fitzke made the correct decision by not sending Rodriguez to surgery before April 20, 2012, given the information available at that time.

## 3. Procedural History

Rodriguez filed her complaint in August 2013, and the matter proceeded to a jury trial in April 2016. The following allegations of negligence against Fitzke were submitted to the

jury: (1) failing to adequately assess Rodriguez following the April 16, 2012, surgery; (2) canceling an April 18 CT scan; (3) failing to order a CT scan; (4) failing to perform surgery on April 18; and (5) failing to perform surgery on April 19.

During deliberations, the jury submitted a question to the court regarding Duch's note on April 19, 2012. The question and answer by the court are as follows:

> Can we have clarification on Dr. Duch['s] note, Exhibit 56, p: 17:
>
> Assessment & Plan:
>
> #4: Septic Shock — "surgery is following"
>
> Does this mean that a surgical operation is expected to occur, or that the surgical team will be following up?
>
> Response:
>
> You must base your verdict only on the evidence presented to you during the trial and the instructions of law I have given you.

The jury returned a general verdict for appellees. Rodriguez filed a motion for new trial, which was overruled. Rodriguez then perfected a timely appeal. We moved the case to our docket pursuant to our authority to regulate the caseloads of this court and the Nebraska Court of Appeals.[1]

## II. ASSIGNMENTS OF ERROR

Rodriguez assigns, restated and reordered, that the court erred in (1) failing to give the requested jury instruction regarding Fitzke's liability for the negligence of his surgical team; (2) failing to give the requested jury instruction regarding the aggravation of her preexisting condition; (3) allowing appellees' expert, Taddeucci, to give expert testimony on issues not previously disclosed; and (4) permitting Fitzke to quote a nonexpert and nontestifying treating physician regarding the standard of care for his postoperative treatment of Rodriguez.

---

[1] Neb. Rev. Stat. § 24-1106(3) (Reissue 2016).

## III. STANDARD OF REVIEW

[1,2] Whether a jury instruction is correct is a question of law.[2] When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court.[3]

[3,4] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[4] A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.[5]

[5] A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[6]

## IV. ANALYSIS

### 1. TRIAL COURT DID NOT ERR IN REJECTING RODRIGUEZ' REQUESTED JURY INSTRUCTIONS

[6] Jury instructions are subject to the harmless error rule, and an erroneous jury instruction requires reversal only if the error adversely affects the substantial rights of the complaining party.[7] A litigant is entitled to have the jury instructed upon only those theories of the case which are presented by the pleadings and which are supported by competent evidence.[8]

---

[2] See *Armstrong v. Clarkson College*, 297 Neb. 595, 901 N.W.2d 1 (2017).

[3] *Id.*

[4] *Id.*

[5] *Cohan v. Medical Imaging Consultants*, 297 Neb. 111, 900 N.W.2d 732 (2017), *modified on denial of rehearing* 297 Neb. 568, 902 N.W.2d 98.

[6] *Armstrong, supra* note 2.

[7] *Jay v. Moog Automotive*, 264 Neb. 875, 652 N.W.2d 872 (2002).

[8] *Armstrong, supra* note 2.

[7] To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction.[9] However, if the instructions given, which are taken as a whole, correctly state the law, are not misleading, and adequately cover the issues submissible to a jury, there is no prejudicial error concerning the instructions and necessitating a reversal.[10]

(a) Rodriguez Was Not Entitled to Have
Nondelegable Duty Language Included
in Jury Instructions

Rodriguez contends that the court erred by not including nondelegable duty of care language in jury instruction No. 2. She argues that experts on both sides testified that whether Rodriguez was returned to surgery was ultimately Fitzke's decision, as her attending surgeon. Additionally, she argues that she was prejudiced by the potential for jurors to believe that other doctors were negligent in not returning her to surgery and cites the jury's question about Duch's note as evidence of the confusion.

Appellees contend that the nondelegable duty doctrine is not applicable here, because there was no allegation of a negligent error or omission by a person other than Fitzke. They also argue that Rodriguez was not prejudiced, because there was no attempt to shift the blame to a nonparty and the court gave another instruction that Fitzke could still be liable even if another individual was also negligent.

[8] Generally, one who employs an independent contractor is not vicariously liable for physical harm caused to another by the acts or omissions of the contractor or its servants.[11] This is

---

9 *Id.*

10 *Id.*

11 See *Gaytan v. Wal-Mart*, 289 Neb. 49, 853 N.W.2d 181 (2014).

the general rule, because an employer of an independent contractor generally has no control over the manner in which the work is to be done by the contractor, so the contractor, rather than the employer, is the proper party to be charged with the responsibility of preventing the risk and bearing and distributing it.[12] An employer's liability for the breach of a nondelegable duty, however, is an exception to this general rule.[13]

[9,10] A nondelegable duty means that an employer of an independent contractor, by assigning work consequent to a duty, is not relieved from liability arising from the delegated duties negligently performed.[14] As a result of a nondelegable duty, the responsibility or ultimate liability for proper performance of a duty cannot be delegated, although actual performance of the task required by a nondelegable duty may be done by another.[15] Thus, the person owing a nondelegable duty is not excused from taking the necessary precautions by contracting with or relying on others to take necessary precautionary measures.[16]

Whether a duty is nondelegable is a question of law.[17] There is no set formula for determining when a duty is nondelegable.[18] "'Indeed, whether a particular duty is properly categorized as "nondelegable" necessarily entails a *sui generis* inquiry, since the conclusion ultimately rests on policy considerations.'"[19] In a given case, the policy question facing a court is whether, on the facts presented, the public interest warrants imposition upon a person who has delegated a task the duty to guard against

[12] *Id.*

[13] *Eastlick v. Lueder Constr. Co.*, 274 Neb. 467, 741 N.W.2d 628 (2007). Accord *Gaytan, supra* note 11.

[14] *Gaytan, supra* note 11.

[15] *Breeden v. Anesthesia West*, 265 Neb. 356, 656 N.W.2d 913 (2003).

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.* at 363, 656 N.W.2d at 920.

risks implicit in the performance of the task.[20] Courts have often deemed a duty to be nondelegable when the responsibility is so important to the community that the employer should not be permitted to transfer it to another.[21]

In *Long v. Hacker*,[22] we held that a head surgeon is ultimately liable for the negligent acts or omissions of the individuals assisting him or her in surgery.[23] However, we have also held that surgeons are not liable for the failure of hospital employees to execute reasonable instructions left for the treatment of the patient.[24] We have not before considered whether an attending surgeon has a nondelegable duty to diagnose and treat a patient by returning the patient to surgery when necessitated by his or her condition.

In *Morgan v. Mysore*,[25] the plaintiff alleged that the defendant, the internist in charge of the patient's care, was negligent in failing to make a timely diagnosis and treat the patient appropriately. The trial court rejected the plaintiff's requested jury instruction that the defendant had a nondelagable duty "'to be aware of all reasonably available medical information significant to the health of his patient during the time that he is providing medical care to his patient.'"[26] The Court of Appeals affirmed the lower court's decision, because the plaintiff "did not present evidence that [the defendant] delegated or assigned duties in regard to [the patient's] available medical information and [the defendant] did not contend

---

[20] *Id.*

[21] *Id.*

[22] *Long v. Hacker*, 246 Neb. 547, 520 N.W.2d 195 (1994).

[23] See, also, *Hawkes v. Lewis*, 252 Neb. 178, 560 N.W.2d 844 (1997); *Swierczek v. Lynch*, 237 Neb. 469, 466 N.W.2d 512 (1991).

[24] *Darrah v. Bryan Memorial Hosp.*, 253 Neb. 710, 571 N.W.2d 783 (1998), citing *Reifschneider v. Nebraska Methodist Hosp.*, 222 Neb. 782, 387 N.W.2d 486 (1986).

[25] *Morgan v. Mysore*, 17 Neb. App. 17, 756 N.W.2d 290 (2008).

[26] *Id.* at 26, 756 N.W.2d at 298.

that [he] was not required to be aware of all the medical information."[27]

[11] Based on our longstanding precedent on vicarious liability and the nondelegable duty exception, we agree that a nondelegable duty instruction is not appropriate when there are no judicial admissions or evidence that a defendant had assigned the performance of his duties to a subordinate party at the time that the alleged breach occurred.

Here, the court declined to include the following nondelegable duty language requested by Rodriguez in jury instruction No. 2: "[T]he Court has determined as a matter of law that the obligation to return the plaintiff to surgery on the 18th or the 19th, . . . if any, . . . was that of Defendant Greg Fitzke, M.D."

There were no judicial admissions or evidence that Fitzke had assigned his duty to diagnose or treat Rodriguez to a subordinate on April 18 or 19, 2012. Further, Fitzke, and experts on both sides, testified that, as Rodriguez' attending surgeon, it was ultimately his decision whether or not to return Rodriguez to surgery on April 18 or 19 and that no other doctor could force Fitzke to return her to surgery. Therefore, assuming, without deciding, that Fitzke had a nondelegable duty to diagnose and treat Rodriguez by returning her to surgery, the evidence did not support a nondelegable duty instruction. Consequently, the court did not abuse its discretion in rejecting the instruction.

Rodriguez' argument that she was prejudiced by the potential for jurors to find other parties negligent without this instruction and reference to the jury's question regarding Duch's note are unavailing. First, as discussed above, the negligence of another party was irrelevant, absent evidence that Fitzke had delegated his duty to diagnose or treat Rodriguez to another party. Second, while there was evidence adduced regarding the negligence of other doctors and nurses and Fitzke testified

---

[27] *Id.*

that another surgeon could have returned Rodriguez to surgery if her condition necessitated it, a different instruction by the court informed the jury that the negligence of other parties was no defense to finding Fitzke liable for Rodriguez' entire injury if he was also negligent.

### (b) Rodriguez Cannot Show Prejudice From Court's Denial of Her Preexisting Condition Instructions

Rodriguez requested two alternative instructions on preexisting conditions. Initially, she contends that there was evidence that she had a preexisting condition consisting of a necrotic gallbladder prior to April 17, 2012. In the alternative, she contends that there is evidence that beginning April 16, she had a preexisting condition of a perforated bowel resulting from her surgery on that date, which perforation continued until April 20, when it was repaired. She argues that both her instructions are correct statements of the law and are supported by the evidence adduced at trial. Additionally, she asserts that she was prejudiced by the jury's not knowing that it could rule in her favor even if her damages could not be separated from the injuries resulting from her preexisting conditions.

Appellees contend that Rodriguez was not prejudiced by the court's rejection of her instructions, because the instructions concern only the apportionment of damages and, by entering a general verdict, the jury never reached the issue of damages.

Rodriguez requested the following instruction, which is partially based on NJI2d Civ. 4.09:

> There is evidence that the Plaintiff had a pre-existing condition consisting of a necrotic gallbladder prior to April 17, 2012. The Defendants are only liable for any damages that you find to be proximately caused by the Defendants' medical negligence.
>
> If you cannot separate damages caused by the pre-existing conditions from those caused by the medical

negligence, then the Defendants are liable for all of those damages.

The Defendants may be liable for harm to the Plaintiff even though her ultimate injury is greater than usual due to the pre-existing gallbladder condition which predisposed her to at least some minimal post-operative care. In short, the Defendants take the Plaintiff as they find her.

In the alternative, Rodriguez requested the following instruction:

There is evidence that beginning April 16, 2012, Plaintiff had a perforated bowel resulting from her April 16, 2012 surgery, which perforation continued until April 20, 2012 when it was repaired. Plaintiff claims it was not timely repaired and Defendant is only liable for any damages that you find to be proximately caused by the delay. If you cannot separate damages caused by the preexisting perforation from those caused by the delay, then Defendant is liable for all of those damages.

[12] In *David v. DeLeon*,[28] we held that a preexisting condition jury instruction, which was similar to the first two paragraphs of Rodriguez' initial instruction, did not permit a jury to assess damages in any amount unless the plaintiff first proved proximate cause.

In *Golnick v. Callender*,[29] we considered whether the court committed error in giving a preexisting condition jury instruction similar to the first two paragraphs of Rodriguez' initial instruction but omitting the third paragraph, which was similar to the third paragraph of Rodriguez' instruction. We held that the plaintiff was not prejudiced because, unlike cases where we approved all three paragraphs, the jury had returned a general verdict.

---

[28] *David v. DeLeon*, 250 Neb. 109, 547 N.W.2d 726 (1996).

[29] *Golnick v. Callender*, 290 Neb. 395, 860 N.W.2d 180 (2015).

[13] We stated that "[w]hen the jury returns a general verdict for one party, we presume that the jury found for the successful party on all issues raised by that party and presented to the jury."[30] Accordingly, we interpreted the verdict as finding that the plaintiff failed to prove that the defendant was the proximate cause of the plaintiff's injuries.

Here, the jury also returned a general verdict. Accordingly, we presume that the jury found for appellees on all issues presented to it. Because the jury presumably decided that Fitzke was not negligent or the proximate cause of Rodriguez' injuries, the jury never reached the issues of preexisting conditions or damages. Accordingly, this assignment of error is without merit.

## 2. Record on Appeal Is Insufficient to Review Whether Trial Court Erred in Permitting Taddeucci to Answer Certain Questions

Rodriguez contends that Taddeucci should not have been allowed to provide standard of care opinions regarding Fitzke's postoperative care, because appellees did not disclose in discovery that Taddeucci would provide such opinions. She argues that appellees violated Neb. Ct. R. Disc. § 6-326(e)(1)(B) by not supplementing their interrogatory to disclose that Taddeucci would testify regarding postoperative care. She argues that the appropriate sanction was to preclude Taddeucci from testifying about Rodriguez' postoperative care.

Appellees contend that they did not violate § 6-326(e)(1)(B), because Rodriguez called Taddeucci in her case in chief and questioned him extensively regarding Fitzke's postoperative care. Accordingly, they assert that she opened the door to cross-examination on the subject and that the question and answer Rodriguez identified did not call for or elicit a standard of care opinion.

---

[30] *Id.* at 410, 860 N.W.2d at 193-94.

The Nebraska Court Rules of Discovery in Civil Cases provide, in relevant part, the following:

[Rule 26]
### § 6-326. General provisions governing discovery.

. . . .

(b) Scope of Discovery. Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:

. . . .

(4) Trial Preparation: . . . .

(A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

. . . .

(e) Supplementation of Responses. A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his or her response to include information thereafter acquired, except as follows:

(1) A party is under a duty seasonably to supplement his or her response with respect to any question directly addressed to

. . . .

(B) the identity of each person expected to be called as an expert witness at trial, the subject matter on which he or she is expected to testify, and the substance of his or her testimony.[31]

[Rule 33]
### § 6-333. Interrogatories to parties.

(a) Availability; Procedures for Use. . . .

---

[31] § 6-326.

Each interrogatory shall be repeated and answered separately and fully in writing under oath . . . . The party submitting the interrogatories may move for an order under [§ 6-3]37(a) with respect to any objection to or other failure to answer an interrogatory.[32]

[Rule 37]

**§ 6-337. Failure to make discovery: sanctions.**

. . . .

(d) Failure of Party to Attend at Own Deposition or Serve Answers to Interrogatories or Respond to Request for Inspection. If a party . . . fails

. . . .

(2) To serve answers or objections to interrogatories submitted under [§ 6-3]33, after proper service of the interrogatories . . . .

(3) . . . the court in which the action is pending on motion may make such orders in regard to the failure as are just, and among others it may take any action authorized under paragraphs (A), (B), and (C) of subdivision (b)(2) of this rule.

. . . .

The failure to act described in this subdivision may not be excused on the ground that the discovery sought is objectionable unless the party failing to act has applied for a protective order as provided by [§ 6-3]26(c).[33]

Further, a sanction authorized by § 6-337(b)(2)(B) is "[a]n order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him or her from introducing designated matters in evidence."

Appellees' answers to Rodriguez' interrogatories and designation of experts included the following:

**Interrogatory No. 17:** Identify each expert witness whom you intend to call to testify at trial in this action and state for each such expert:

_____

[32] Neb. Ct. R. Disc. § 6-333.

[33] Neb. Ct. R. Disc. § 6-337.

(a) The subject matter on which the expert is expected to testify;

(b) The substance of facts and opinions on which the expert is expected to testify;

(c) The basis for each opinion to be given by the expert . . . .

. . . .

**Supplemental Answer:**

. . . .

5a. Raymond Taddeucci . . . [;]

b. Dr. Taddeucci is expected to express the opinions set forth in his deposition taken by [Rodriguez;]

c. The operative technique of Dr. Fitzke complied with reasonable standards of care[;]

d. The basis is expected to be set forth in the deposition of Dr. Taddeucci taken by [Rodriguez] and information set forth in the medical records.

In Rodriguez' opening brief, she identified the following question as erroneously permitted, over objection, by the court:

"Q. Now, based upon the — looking at this without the hindsight of knowing there turned out to be an intestinal perforation, looking at this from the standpoint of what was known to the physicians attending . . . Rodriguez throughout the period that we've talked about here today, was there ever a point where in your opinion the patient was required to be taken back to surgery?"[34]

In Rodriguez' reply brief, she also argued that she was prejudiced by Taddeucci's being permitted to respond, over objection, to the following question: "'With regards to the decision of . . . Fitzke to cancel the CT scan, do you believe that complied with the appropriate standards of care?'"[35]

[14] We begin by noting that the purpose of an appellant's reply brief is to respond to the arguments the appellee

---

[34] Brief for appellant at 23.

[35] Reply brief for appellant at 9.

has advanced against the errors assigned in the appellant's initial brief.[36] While this second question is encompassed in Rodriguez' assignment of error, her attempt to raise it for the first time in her reply brief is untimely, because it gave appellees no opportunity to respond.[37]

[15] Further, it is incumbent upon the appellant to present a record supporting the errors assigned; absent such a record, an appellate court will affirm the lower court's decision regarding those errors.[38]

The question Rodriguez bases her claim on concerns the postoperative care provided to Rodriguez by Fitzke. Regarding Rodriguez' interrogatory requesting appellees to identify the scope of opinions that Taddeucci would provide, appellees stated that he would provide opinions regarding Fitzke's operative technique and "the opinions set forth in his deposition taken by [Rodriguez]."

Rodriguez' deposition of Taddeucci is not included in the record. Accordingly, we do not know whether the subject of Fitzke's postoperative care was discussed in the deposition. Therefore, we are unable to assess whether appellees failed to comply with § 6-326, because we cannot determine the scope of Taddeucci's expected testimony that was actually disclosed in the interrogatory. Because Rodriguez failed to satisfy her duty to present a record that supported her assignment of error, we affirm the court's ruling on this issue.

### 3. FITZKE'S TESTIMONY WAS PERMITTED UNDER NEBRASKA RULES OF EVIDENCE

Rodriguez argues that, in response to one of her questions, Fitzke provided a nonresponsive, hearsay answer that stated the opinion of Allen, who was not designated as an expert. She again contends that appellees violated § 6-326 by failing

---

[36] *Hike v. State*, 297 Neb. 212, 899 N.W.2d 614 (2017).

[37] *Id.*

[38] *In re Estate of Radford*, 297 Neb. 748, 901 N.W.2d 261 (2017).

to disclose Allen as an expert, her opinion, and the relevant foundation for her opinion. Rodriguez further contends that classifying the testimony as Fitzke's perception is merely pretext to admit Allen's testimony.

Appellees argue that Fitzke did not provide Allen's opinion. Instead, they contend that he stated only his perception of her opinion, which said nothing about the truth of his belief. Further, they assert that the answer was directly responsive to Rodriguez' line of questioning and that precise question because it was asking if he disregarded her opinion.

Rodriguez' objection concerned Fitzke's answer to the final question from Rodriguez' attorney in the following interchange:

> Q. Okay. And did Dr. Allen put at the bottom here, question mark, "Need to go back to OR"?
>
> A. She did write that, yes.
>
> Q. So there is at least one question mark in this record relative to your return — relative to the question of whether you need to take her back to surgery; correct?
>
> A. An internist questioned whether or not going back to the operating room would be helpful.
>
> Q. So this is the second time that an internist, meaning a hospitalist, has had a suggestion about the care and you've answered the question, no. We've heard about the CAT scan and going back to the OR; correct?
>
> A. No, that's not correct. I canceled the CAT scan, and there was a question as to — from Dr. Allen's standpoint as to whether we felt going back to the operating room would be helpful at that point in time, and we had a discussion, and we or I decided — I ultimately decided that she did not need to go back to the operating room, but we discussed the factors that were in front of us, and *I believe that she agreed.*

(Emphasis supplied.)

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered

in evidence to prove the truth of the matter asserted."[39] Neb. Evid. R. 701, Neb. Rev. Stat. § 27-701 (Reissue 2016), provides:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

In his testimony, Fitzke did not relay any out-of-court statements made by Allen, but merely described his perception of Allen's opinion after speaking with her. Since Fitzke's statement was limited to his perception of Allen's opinion, it was permissible under § 27-701. Fitzke established that he had firsthand knowledge of what Allen said in the discussion and his belief as to her opinion on the topic was an inference that was rationally based on the conversation of the subject. Further, it cannot rationally be argued that the testimony was not helpful to the determination of whether Fitzke breached the standard of care by not returning Rodriguez to surgery on April 19, 2012. The credibility of his opinion of her conclusion goes to the weight of the statement, rather than to its admissibility.[40]

Accordingly, his statement was not hearsay and did not support a violation of § 6-326 by presenting an undisclosed opinion of an undisclosed expert.

[16-18] Even if Fitzke's answer was hearsay, Neb. Evid. R. 703, Neb. Rev. Stat. § 27-703 (Reissue 2016), provides that an expert may rely on hearsay facts or data reasonably relied upon by experts in that field.[41] Specifically, a medical expert may express opinion testimony in medical matters based, in part,

---

[39] Neb. Evid. R. 801(3), Neb. Rev. Stat. § 27-801(3) (Reissue 2016).

[40] See *Harmon Cable Communications v. Scope Cable Television*, 237 Neb. 871, 468 N.W.2d 350 (1991).

[41] *State v. Hudson*, 268 Neb. 151, 680 N.W.2d 603 (2004).

on reports or statements of others which are not in evidence but upon which the expert customarily relies in the practice of his or her profession.[42] While the mere fact that an expert relied on hearsay, however, does not transform it from inadmissible into admissible evidence,[43] we have permitted inadmissible evidence, upon which an expert relies, to be admitted on direct examination if it was offered not to prove the truth of the matter asserted but simply to demonstrate the basis for the expert's testimony.[44]

Fitzke was disclosed as an expert who would testify regarding whether he "applied the degree of skill and knowledge expected of a reasonable and prudent general surgeon . . . managing . . . a patient post-operatively." To the extent that his answer was addressing whether he exercised an appropriate degree of skill and knowledge in caring for Rodriguez postoperatively, Fitzke's statement regarding his understanding of Allen's opinion was offered to show that he believed he was not disregarding the opinion of another physician involved in Rodriguez' treatment; it was not offered to prove that Allen did not believe that Rodriguez needed to be returned to surgery. Further, as part of his statement, Fitzke provided his independent opinion, which he reached, in part, based on Allen's opinion. The opinion of an internist involved in the treatment of a postoperative patient is clearly a fact relied upon by experts in the medical field. Accordingly, to the extent that hearsay of Allen's opinion was admitted into evidence through Fitzke's testimony, it was permitted, under § 27-703.

Fitzke's answer was also responsive to the question by Rodriguez' attorney. Rodriguez' attorney had asked whether

---

[42] *Id.*

[43] See *Vacanti v. Master Electronics Corp.*, 245 Neb. 586, 514 N.W.2d 319 (1994).

[44] See *Koehler v. Farmers Alliance Mut. Ins. Co.*, 252 Neb. 712, 566 N.W.2d 750 (1997).

Allen questioned whether Rodriguez needed to be returned to the operating room. He then went on to directly question whether Fitzke disregarded Allen's opinion about whether Rodriguez needed to be returned to the operating room. Accordingly, Fitzke's statement that he discussed the note Allen made with her and believed that she changed her opinion to agree with him was directly relevant to whether or not he was disregarding her opinion. Accordingly, this assignment of error is without merit.

## V. CONCLUSION

We find that the court did not err in rejecting Rodriguez' proposed jury instructions or jury instruction language. Further, we find that the record on appeal is insufficient to review whether the court erred in permitting Taddeucci to answer certain questions. Finally, we conclude that the court did not abuse its discretion by ruling Fitzke's answer was admissible. Therefore, we affirm.

AFFIRMED.

WRIGHT, J., not participating in the decision.