Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/06/2020 08:06 AM CST

State of Nebraska, appellee, v.
Joshua Dady, appellant.

___ N.W.2d ___

Filed December 13, 2019.    No. S-18-948.

1. **Jury Instructions: Judgments: Appeal and Error.** Whether jury instructions given by a trial court are correct is a question of law. When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below.

2. **Jury Instructions: Appeal and Error.** Jury instructions are subject to the harmless error rule, and an erroneous jury instruction requires reversal only if the error adversely affects the substantial rights of the complaining party.

3. **Verdicts: Appeal and Error.** Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict surely would have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error.

4. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.

5. **Criminal Law: Evidence: Appeal and Error.** When examining a sufficiency of the evidence claim, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

6. **Rules of Evidence: Hearsay: Appeal and Error.** Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination whether the

court admitted evidence over a hearsay objection or excluded evidence on hearsay grounds.

7. **Judgments: Appeal and Error.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

8. **Sexual Assault.** Under Neb. Rev. Stat. § 28-319(1)(b) (Reissue 2016), whether the victim was incapable of consent depends upon a specific inquiry into the victim's capacity, i.e., whether the victim was mentally or physically incapable of resisting or appraising the nature of his or her conduct.

9. ____. Neb. Rev. Stat. § 28-319(1)(b) (Reissue 2016) applies to a wide array of situations that affect a victim's capacity, including age.

10. **Jury Instructions: Evidence: Appeal and Error.** When examining for harmless error, the court may look at a variety of factors including the jury instructions as a whole, the evidence presented at trial, and the closing arguments.

11. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh the evidence; such matters are for the finder of fact.

12. **Rules of Evidence: Hearsay: Proof.** Evidence is admissible under Neb. Rev. Stat. § 27-803(3) (Reissue 2016) when the party seeking to introduce the evidence demonstrates (1) that the circumstances under which the statements were made were such that the declarant's purpose in making the statements was to assist in the provision of medical diagnosis or treatment and (2) that the statements were of a nature reasonably pertinent to medical diagnosis or treatment by a medical professional.

13. **Appeal and Error.** To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error.

14. **Sentences.** When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the violence involved in the commission of the crime. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

Appeal from the District Court for Douglas County: Gregory M. Schatz, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, Timothy F. Shanahan, and Abbi R. Romshek for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E. Duffy for appelllee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Freudenberg, J.

## NATURE OF CASE

Appellant was convicted of first degree sexual assault under Neb. Rev. Stat. § 28-319(1)(b) (Reissue 2016). Appellant was 18 years old at the time, and the victim was 10 years old. Appellant was found guilty, and he now assigns several errors on appeal. These errors focus on several rulings by the district court related to the knowledge element of the crime charged and whether age can be a factor in a jury's determination of capacity under § 28-319(1)(b). For the reasons set forth below, we affirm the judgment of the district court.

## FACTS

Joshua Dady was charged with first degree sexual assault after he admitted to police that he had sex with M.J., a 10-year-old girl. While Dady was 18 years old and within 4 days of their meeting, Dady engaged in vaginal intercourse with M.J. Dady was charged under § 28-319(1)(b). Section 28-319(1) makes it a crime for "[a]ny person [to subject] another person to sexual penetration . . . (b) who knew or should have known that the victim was mentally or physically incapable of resisting or appraising the nature of his or her conduct[.]" Following a jury trial, Dady was convicted and sentenced to 20 to 25 years' imprisonment. Dady appeals.

Dady first met and talked with M.J. for approximately an hour after she exited a schoolbus a few blocks from her home

on a Thursday or Friday afternoon. M.J. testified that Dady told her he was 16 years old and that she told Dady she was 10 years old.

M.J.'s stepfather saw M.J. and Dady talking and introduced himself and then walked M.J. into the house. When M.J.'s stepfather noticed Dady following everyone into the home, he told Dady to leave. M.J.'s stepfather also asked Dady if he knew how old M.J. was, and Dady said no. He then told Dady that M.J. was 10 years old. M.J. later encountered Dady while she was walking her dog. M.J. testified that they discussed "YouTubers" for an unknown length of time. M.J. testified she thought that she and Dady "hung out" again later in the day on a Saturday. M.J.'s mother testified that M.J. came to her on that Saturday and asked to go to a mall with Dady. M.J.'s mother told M.J. she could not go to the mall with Dady because she did not know him.

On the morning of Sunday, August 20, 2017, M.J. met up with Dady for about an hour, then went home for lunch and to clean her room. After lunch, M.J. returned to Dady's house and sat on the curb. After approximately 5 minutes, Dady invited M.J. to sit by a fence in the yard. Dady asked M.J. if she had a boyfriend and then suggested to M.J. that they should have sex. M.J. testified that she had originally said no, but then agreed after Dady offered to give her an "MP3 player." M.J. and Dady began kissing. Dady then pulled down his shorts and put a condom on. M.J. testified that she knew what a condom was but had not seen one before and did not know what Dady meant when he said, "'We can't let this go to waste now.'" Dady then pulled down M.J.'s pants and pulled M.J. on top of him. M.J. testified that Dady's pulling her on top of him was not forced. M.J.'s statements to medical personnel and her testimony at trial were that she knew what sex was and that she willingly engaged in sex with Dady.

Neighbors saw M.J. pull down her pants and attempt to sit on Dady's lap. They ran outside and confronted M.J. and Dady. M.J. and Dady both stood up and pulled their pants up as the neighbors approached. M.J. testified that she asked Dady to

"'[p]romise not to tell'" what happened. The neighbors told M.J.'s stepfather and then informed Dady's foster father of what they had seen. The neighbors testified they had seen Dady and M.J. "hanging out" earlier in the day when M.J. was riding around the neighborhood on a "bike [with] flowers on it."

M.J.'s stepfather called M.J. home. When M.J. arrived home, she went to her room and would not speak with either her stepfather or her mother. M.J.'s mother then called the 911 emergency dispatch service. M.J. was taken to a child advocacy center and then to a hospital to be examined by a sexual assault nurse.

Police, responding to the 911 call, interviewed M.J.'s mother and then went to Dady's foster home. Dady and his foster father came outside and spoke with the police. Dady admitted to police that he had sexually penetrated M.J.'s vagina and that he was 18 years old. The police placed Dady under arrest, and he was taken to a police station for an interview. Police obtained consent from Dady's foster father to search the yard and the home. Police found a condom wrapper in the yard and a used condom in a trash can in Dady's bedroom.

During the interview with police, Dady claimed M.J. told him that she was 16 or 17 years old and that she was going to be a freshman in high school. Dady initially denied that his penis penetrated M.J.'s vagina, but later stated that a small portion of his penis went inside M.J.'s vagina. Dady also told police that he put his finger in M.J.'s vagina, but that she told him to stop because it was hurting her. Dady also told police that he put his penis in M.J.'s mouth for a "millisecond."

Dady said M.J. told him on the day of the incident that her mother says she is 10 years old, but that she is a freshman in high school and was about to turn 16 years old. At the end of the interview, when asked how old he thought M.J. looked, Dady admitted she looked 10 or 11 years old.

Susan Kelly, an emergency room pediatrician, testified concerning M.J.'s visit to the emergency room on the night of the incident. Kelly testified that M.J. or M.J.'s mother relayed that M.J. had been diagnosed with attention deficit hyperactivity

disorder (ADHD), oppositional defiant disorder (ODD), and disruptive mood dysregulation disorder (DMDD). This was done while Kelly was ascertaining M.J.'s medical history for the purpose of treating her in the emergency room. Dady objected on the ground of hearsay and was overruled.

Kelly explained the various stages of cognitive development of children and testified that a normal 10-year-old's brain has not fully developed the ability to assess risk and control impulses. Kelly further testified as to how diagnoses of ADHD and ODD can affect a person's ability to control impulses. On cross-examination, Kelly testified that her impressions of M.J.'s ability to understand the nature of sex were based upon her time spent with M.J., M.J.'s past diagnoses, and the general categorization of a 10-year-old's capacity. When asked to give further support for her conclusion that M.J. was not capable of appraising the nature of sex, Kelly testified that M.J. did not know when her last period occurred. Further, Kelly testified that when she asked M.J. if a condom was used in the incident, M.J. responded, "'I think so.'"

Additional evidence of M.J.'s mental health diagnoses was presented through the testimony of the forensic interviewer who saw M.J. at the child advocacy center. She testified that ADHD, ODD, and DMDD can affect emotional stability and impulse control. She indicated the severity of each of these conditions can vary based on the individual. She admitted that she is not licensed to diagnose these conditions; however, she stated that it is important for an interviewer to know a child's mental health diagnoses in order to tailor the interview to the child. She testified that M.J. appeared to be a developmentally normal 10-year-old and indicated that no formal testing of cognitive ability was done.

M.J.'s mother testified that M.J. has had behavioral and mental health issues since she was approximately 4 years old. M.J.'s mother testified that M.J. had been diagnosed with ADHD, ODD, and DMDD. Dady objected on grounds of foundation and hearsay and was overruled. On cross-examination,

Dady elicited testimony from M.J.'s mother that the diagnoses had come from M.J.'s doctor. Dady made a motion to strike M.J.'s mother's testimony on hearsay and Confrontation Clause grounds. M.J.'s mother also testified that M.J.'s mental health problems have resulted in M.J.'s hospitalization more than 10 times. M.J.'s mother testified these hospitalizations normally occur after M.J. becomes physically and emotionally escalated or when M.J. threatens to harm herself.

M.J.'s mother testified that she had age-appropriate conversations about sex with M.J. M.J.'s mother expressed that prior to the incident, M.J. understood the physical aspects of what sex is. M.J.'s mother explained that some of the conversations were prompted by M.J.'s being accused of inappropriate sexual touching of her half sister. The incidents with her half sister resulted in M.J.'s being hospitalized and then receiving treatment at a residential treatment facility for approximately 5 months.

At the close of the State's case, Dady made a motion to dismiss. Dady claimed the State failed to prove that M.J. lacked capacity and that Dady knew or had reason to know M.J. lacked capacity under the statute. The court denied the motion.

At the conclusion of evidence, Dady objected to jury instruction No. 6 proposed by the court. Dady submitted an alternate instruction based on the definition of mental impairment taken from *In re Interest of K.M.*[1] Instruction No. 6 provided in part: "'Mentally Incapable' means that because of the victim's age or mental impairment, the victim was incapable of resisting or appraising the nature of her sexual conduct. 'Mental Impairment' means the victim's impairment was so severe that she lacked the capacity to consent to sexual conduct with the Defendant."

Dady's proposed jury instruction stated in relevant part:

"Mentally or physically incapable of resisting or appraising the nature of her conduct" shall mean a significant abnormality on the part of the victim such as

---

[1] *In re Interest of K.M.*, 299 Neb. 636, 910 N.W.2d 82 (2018).

severe intoxication or other substantial mental or physi-
cal impairment. In order for a mental impairment to
be substantial, it must be severe; a person in this cat-
egory is treated as equivalent to a severely intoxicated
or an unconscious person. Not every mental challenge or
impairment is so severe that the person lacks the capacity
to resist or appraise the nature of her conduct.

The court gave its proposed instruction No. 6. Other instruc-
tions, given without objection, provided that the jury must
apply the law in the instructions and that no one instruction
contains all of the law applicable to this case. A further instruc-
tion provided the specific elements of the charge using the
language of § 28-319(1)(b).

After the jury returned a guilty verdict, Dady made a motion
for a judgment notwithstanding the verdict or, in the alterna-
tive, for a new trial. Dady provided several arguments in sup-
port of the motion, only two of which were assigned on appeal.
First, Dady argued that the jury instructions were incorrect and
prejudicial. Second, Dady argued that there were irregularities
in the proceedings of the court, the prosecuting attorney, and
the witnesses for the State prejudicial to his rights. The alleged
trial irregularities related to the court's change in its ruling on
whether Dady could present evidence under Neb. Rev. Stat.
§ 27-412 (Reissue 2016) of three sexual encounters M.J. had
with other people.

Dady had provided notice before trial that he intended
to use evidence under § 27-412 to demonstrate M.J.'s prior
knowledge and sexual activities. Specifically, Dady wanted to
question M.J. concerning certain episodes of sexual conduct
between M.J. and her half sister, between M.J. and her cousin,
and between M.J. and her brother. The encounters with the half
sister occurred before the events with Dady, the encounter with
her cousin occurred after the incident with Dady, and the tim-
ing of the encounter with her brother was unknown. The State
filed a motion in limine to exclude evidence of the encounters,
asserting that the encounters were not relevant.

The court initially determined that Dady would not be allowed to question M.J. concerning the three encounters. However, the court did allow Dady to question M.J.'s mother about one hospitalization and whether it occurred because of an incident between M.J. and her half sister.

As the trial progressed and the court learned more about the nature of the case, the court reconsidered its initial ruling on the motion in limine. Before cross-examination of M.J. began, the court reversed its prior decision and indicated to both parties that it was going to allow some questioning about M.J.'s previous sexual encounters because such evidence could demonstrate M.J.'s ability to appraise the nature of her conduct. After the cross-examination of M.J. began, the court took a recess, dismissed the jury, and reversed its decision again, back to its original position. The court specified that it would allow questioning which could tend to prove M.J. knew what vaginal intercourse is or what sexual arousal is, but would not allow the further questioning of M.J. about the past sexual encounters. The court reasoned that the information to be obtained from questioning about the encounters and the subsequent hospitalizations was not relevant.

The court denied Dady's posttrial motion for judgment notwithstanding the verdict or for a new trial. At the sentencing hearing, the judge took into account Dady's unfortunate upbringing, his maturity level, and his previous criminal history. The court noted that Dady had already received counseling and education concerning appropriate sexual conduct before the incident in this case occurred. The court noted that probation and education did not deter Dady. The court explained the serious nature of the offense and took into consideration the likelihood that Dady would reoffend. The court sentenced Dady to 20 to 25 years' imprisonment.

## ASSIGNMENTS OF ERROR

Dady asserts, renumbered and rephrased, that the trial court erred by (1) giving a jury instruction that incorrectly stated the law; (2) failing to give Dady's proposed jury instruction;

(3) failing to find the evidence presented at trial was insufficient to sustain a guilty verdict; (4) admitting evidence that M.J. was diagnosed with ADHD, ODD, and DMDD; (5) excluding evidence of M.J.'s other sexual conduct; (6) denying Dady's motion for a new trial; and (7) imposing an excessive sentence.

## STANDARD OF REVIEW

[1] Whether jury instructions given by a trial court are correct is a question of law. When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below.[2]

[2] Jury instructions are subject to the harmless error rule, and an erroneous jury instruction requires reversal only if the error adversely affects the substantial rights of the complaining party.[3]

[3] Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict surely would have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error.[4]

[4] To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.[5]

[5] When examining a sufficiency of the evidence claim, the relevant question for an appellate court is whether, after

---

[2] *State v. McCurry*, 296 Neb. 40, 891 N.W.2d 663 (2017).

[3] *Rodriguez v. Surgical Assocs.*, 298 Neb. 573, 905 N.W.2d 247 (2018).

[4] *State v. Huerta*, 26 Neb. App. 170, 917 N.W.2d 175 (2018).

[5] *State v. Mueller*, 301 Neb. 778, 920 N.W.2d 424 (2018), *modified on denial of rehearing* 302 Neb. 51, 921 N.W.2d 584 (2019).

viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[6]

[6] Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination whether the court admitted evidence over a hearsay objection or excluded evidence on hearsay grounds.[7]

[7] Evidentiary questions committed to the discretion of the trial judge,[8] orders denying a motion for new trial,[9] and claims of excessive sentencing[10] are all reviewed for abuse of discretion. An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[11]

## ANALYSIS

Dady asserts it was reversible error for the district court to give instruction No. 6 and fail to give his proposed instruction. Dady asserts the evidence presented at trial failed to prove that M.J. suffered from a mental impairment and that Dady knew of M.J.'s mental impairment. Dady also asserts that the testimony of M.J.'s mental health diagnoses was inadmissible hearsay. Dady argues that he was deprived of a fundamentally fair trial when the court refused to allow him to elicit testimony of M.J.'s previous hospitalizations and to link the hospitalizations to M.J.'s previous sexual encounters. Lastly, Dady asserts that the trial court did not properly

---

[6] See *State v. McCurdy*, 301 Neb. 343, 918 N.W.2d 292 (2018).

[7] *State v. Mora*, 298 Neb. 185, 903 N.W.2d 244 (2017).

[8] See *State v. Briggs*, 303 Neb. 352, 929 N.W.2d 65 (2019).

[9] *Briggs, supra* note 8.

[10] See *State v. Erickson*, 281 Neb. 31, 793 N.W.2d 155 (2011).

[11] *State v. Gibson*, 302 Neb. 833, 925 N.W.2d 678 (2019).

weigh several factors, including Dady's social background and desire for rehabilitation, when imposing his sentence. As will be explained below, we find the court erred in including the ambiguous phrase "because of the victim's age" in instruction No. 6 and in overruling Dady's hearsay objection to the testimony of M.J.'s mother about M.J.'s mental health diagnoses. However, we find both errors to be harmless. M.J.'s mother's testimony was cumulative to Kelly's testimony, and the ambiguity of instruction No. 6 was clarified by a combination of the jury instructions' being taken as a whole and the manner of the State's presentation of its case and closing arguments.

## JURY INSTRUCTIONS

Dady asserts that instruction No. 6 misstates the law because age is not a permissible consideration under § 28-319(1)(b) in determining whether a victim was mentally or physically incapable of resisting or appraising the nature of his or her conduct. Alternatively, Dady asserts that if age is a permissible consideration under § 28-319(1)(b), instruction No. 6 was misleading because it indicated that based upon a simple determination that M.J. was 10 years old, the jury could find M.J. mentally or physically incapable of resisting or appraising the nature of her conduct. Dady argues that his proposed instruction should have been given instead because it would have properly informed the jury that "mentally or physically incapable of resisting or appraising the nature of . . . her conduct" under § 28-319(1)(b) requires the jury to find that M.J. had a significant abnormality.

We disagree with Dady's argument that by omitting any explicit reference to age in § 28-319(1)(b), while specifying age in the statutory rape provision of subsection (1)(c), the Legislature clearly indicated that age is not a permissible consideration in determining whether subsection (1)(b) was violated. We recognize that other states have statutory rape laws directed at persons near the age of majority who

sexually prey on younger children.[12] Nebraska does not. The only statute relevant to such scenario is § 28-319(1)(b). The statutory rape provisions of § 28-319(1)(c), and of other jurisdictions addressing older individuals' preying upon children, are distinguishable from § 28-319(1)(b) insofar as the victim of the specified age is conclusively regarded under such statutes as incapable of giving consent to the sexual act.[13] By specifying age in subsection (1)(c) and not in subsection (1)(b) of § 28-319, the Legislature was making a distinction between statutory rape under subsection (1)(c) and a violation of subsection (1)(b) requiring an individualized inquiry into the victim's capacity. Section 28-319(1)(b) does not create a statutory presumption based on age that the victim is incapable of consent.

[8,9] It does not follow, however, that age is irrelevant to determining a victim's capacity for purposes of § 28-319(1)(b). Under § 28-319(1)(b), whether the victim was incapable of consent depends upon a specific inquiry into the victim's capacity, i.e., whether the victim was mentally or physically incapable of resisting or appraising the nature of his or her conduct. We have long held that § 28-319(1)(b) applies to a wide array of situations that affect a victim's capacity, including age.[14]

Thus, while we would agree with Dady's contention that in charges brought under § 28-319(1)(b), a jury cannot find inability to consent in a manner similar to such a finding under statutory rape provisions based exclusively on age, we disagree with Dady's contention that a victim's age is an irrelevant consideration in determining whether a specific victim was mentally or physically incapable of resisting or appraising the nature of his or her conduct. The jury is permitted to conclude

---

[12] See, e.g., Colo. Rev. Stat. Ann. § 18-3-402(1)(d) (West Cum. Supp. 2018) (victim less than 15 years old with 4-year age gap between victim and perpetrator).

[13] See *George v. State*, 61 Neb. 669, 85 N.W. 840 (1901).

[14] See *State v. Collins*, 7 Neb. App. 187, 583 N.W.2d 341 (1998).

the victim was mentally or physically incapable of resisting or appraising the nature of his or her conduct based upon evidence that a child of the victim's age ordinarily lacks sufficient brain development to have such capacity and that the victim was developmentally normal for his or her age.

But we agree with Dady that instruction No. 6 was potentially misleading as to whether the jury could find inability to consent in a manner similar to such a finding under statutory rape provisions based on age. Instruction No. 6 explained to the jury the respective definitions of the terms "mentally incapable" and "mental impairment." "Mentally incapable" was correctly defined inasmuch as it described a victim "incapable of resisting or appraising the nature of her sexual conduct." "Mental impairment" was correctly defined as a "victim's impairment . . . so severe that she lacked the capacity to consent to sexual conduct with the Defendant." The problem is that the definition of "mentally incapable" was prefaced with the phrase "because of the victim's age or mental impairment."

We disapprove of this broad "because of the victim's age" phrasing. The phrase "because of the victim's age" is ambiguous as to whether age can be the sole basis for a finding that the victim was mentally incapable, without an individualized assessment of the victim's maturity. The definition of "mentally incapable" could have been excluded from the court's instructions, as the language of § 28-319(1)(b) is sufficiently clear that a definitional instruction would not normally be necessary. Because instruction No. 6 was ambiguous and capable of misleading the jury, it was erroneous.

[10] But this does not end our inquiry. Alleged errors in a jury instruction are examined using a two-step process.[15] First, the court reviews the case based on the errors assigned and argued, or it may find plain error. Second, when an error is

---

[15] See, *Rodriguez, supra* note 3; *State v. Botts*, 26 Neb. App. 544, 921 N.W.2d 151 (2018).

identified, the court considers whether the error was harmless or prejudicial.[16] Jury instructions are subject to the harmless error rule, and an erroneous jury instruction requires reversal only if the error adversely affects the substantial rights of the complaining party.[17] When examining for harmless error, the court may look at a variety of factors including the jury instructions as a whole, the evidence presented at trial, and the closing arguments.[18]

We conclude that the potentially misleading ambiguity of the phrase "because of the victim's age" in instruction No. 6 did not in fact mislead the jury. The jury's verdict was surely unattributable to this erroneous instruction, because the instructions taken as a whole, combined with the evidence and arguments presented at trial, clarified the ambiguity of "because of the victim's age" such that the jury understood "age" in this context to be a subjective review of M.J.'s developmental age.

Other instructions correctly provided that the jury must apply the law in the instructions and that no one instruction contains all of the law applicable to this case. One correctly provided the specific elements of the charge using the language of § 28-319(1)(b), instructing the jury that it could not find Dady guilty without determining beyond a reasonable doubt that he knew or should have known that M.J. was mentally or physically incapable of resisting or appraising the nature of her conduct. Instruction No. 6 also correctly indicated that the inquiry was victim specific.

To the extent that the ambiguity of the "because of the victim's age" phrasing was not fully clarified by the surrounding

---

[16] See, *Rodriguez, supra* note 3; *Botts, supra* note 15.

[17] *Rodriguez, supra* note 3.

[18] See, *State v. Smith*, 302 Neb. 154, 922 N.W.2d 444 (2019); *Nguyen v. Rezac*, 256 Neb. 458, 590 N.W.2d 375 (1999); *Huerta, supra* note 4; *State v. Beamon*, 336 Wis. 2d 438, 804 N.W.2d 706 (Wis. App. 2011); *Johnson v. State*, 94 So. 3d 1209 (Miss. App. 2011).

instructions alone, it was clarified by the State's theory of the case, the evidence, and the closing arguments. The State presented extensive evidence linking age and normal brain development to M.J.'s specific cognitive abilities. Kelly, the treating emergency room physician, opined that M.J. was incapable of appraising the nature of sexual conduct. Kelly based this opinion on her understanding of normal child cognitive development and on the time she spent with M.J. The State thus presented unrefuted evidence that a normal 10-year-old child's level of cognitive development renders the child unable to appraise the nature of sexual conduct and that M.J. appeared to be a normal 10-year-old. Furthermore, the jurors were able to see M.J. testify and draw their own conclusions about M.J.'s mental capabilities. The court may consider the facts of the case when determining whether a jury instruction was confusing or misleading.[19]

Where a potential ambiguity in an instruction exists, the prosecutor may assist the jury in resolving such ambiguity during closing arguments.[20] The State went step by step during closing arguments through the elements of the crime charged, explaining what "age" in instruction No. 6 meant. The prosecution asked the jury when determining mental and physical capacity to consider the evidence presented at trial that M.J. appeared to be a normal 10-year-old and that a normally developed 10-year-old brain does not have the capacity to appraise the nature of sexual conduct. The State made it clear that the reference "because of the victim's age" in instruction No. 6 was a case-specific inquiry based on the evidence presented.

Viewing instruction No. 6 in context, the jury had a clear and correct understanding of how age related to the question of M.J.'s mental capability of resisting or appraising the nature

---

[19] See *Nguyen, supra* note 18.

[20] See, *Middleton v. McNeil*, 541 U.S. 433, 124 S. Ct. 1830, 158 L. Ed. 2d 701 (2004); *Huerta, supra* note 4.

of her conduct. When the instructions as a whole are combined with the body of evidence on the record and the clarification provided by the prosecution in the closing arguments, the jury was not misled by the ambiguous phrasing of instruction No. 6. Rather, the jury properly understood that age was a consideration in determining M.J.'s level of mental development or developmental age. When considering the instructions as a whole, the evidence presented, and the clarification provided in closing arguments, we find the erroneous jury instruction to be harmless.

Dady also contends that his proposed instruction should have been given instead of instruction No. 6.

> To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction."[21]

Dady's proposed jury instruction provided in relevant part:

> "Mentally or physically incapable of resisting or appraising the nature of her conduct" shall mean a significant abnormality on the part of the victim such as severe intoxication or other substantial mental or physical impairment. In order for a mental impairment to be substantial, it must be severe; a person in this category is treated as equivalent to a severely intoxicated or an unconscious person. Not every mental challenge or impairment is so severe that the person lacks the capacity to resist or appraise the nature of her conduct.

Dady's proposed instruction was based on *In re Interest of K.M.*, where we said:

> To render an individual incapable to consent to sexual conduct, a *mental impairment* must be severe. A person in this category is treated as equivalent to a severely

---

[21] *Mueller, supra* note 5, 301 Neb. at 789, 920 N.W.2d at 434.

intoxicated or an unconscious person. Thus, not every mental challenge or impairment is so severe that the person lacks the capacity to consent. We have said lack-of-capacity sexual assault under § 28-319(1)(b) requires on the part of the victim "a significant abnormality, such as severe intoxication or other substantial mental or physical impairment."[22] This passage from *In re Interest of K.M.* is one way of explaining the concept of mental incapacity as warranted from the facts in that case, which involved an alleged mental impairment. However, as we have already illustrated, *In re Interest of K.M.* should not be construed as exhaustively defining every situation to which § 28-319(1)(b) could be applied. A victim can be incapable of consent without suffering from a "mental impairment."[23]

Dady's proposed instruction was not a correct recitation of our holding from *In re Interest of K.M.*, because it incorrectly indicated that "[m]entally or physically incapable" is limited to a "significant abnormality" constituting a "substantial mental or physical impairment." A child can be incapable of resisting or appraising the nature of his or her conduct without suffering from an "abnormality" or "substantial mental or physical impairment." The court did not err in denying Dady's proposed instruction, because, as applied to the facts of this matter, it was not a correct statement of the law.

### Sufficiency of Evidence

In his challenge to the sufficiency of the evidence, Dady argues that there was insufficient evidence to support a finding that M.J. suffered from a "mental impairment."[24] He does not contest the sufficiency of the evidence to support M.J.'s

---

[22] *In re Interest of K.M., supra* note 1, 299 Neb. at 645, 910 N.W.2d at 89 (emphasis supplied).

[23] See *id.*

[24] Brief for appellant at 22.

inability to consent by virtue of being mentally or physically incapable of resisting or appraising the nature of her conduct for any other reason. Dady also challenges the sufficiency of the evidence to support the necessary element that he knew or should have known that M.J., for whatever reason, was mentally or physically incapable of resisting or appraising the nature of her conduct.

[11] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh the evidence; such matters are for the finder of fact.[25] The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[26] And when there are alternative theories of guilt presented to the jury, we will affirm the verdict if the evidence is sufficient to support any alternative theory presented.[27]

Because we find the evidence sufficient to support a determination that M.J. was incapable of consent by virtue of her stage of development, we need not consider whether the evidence was sufficient to support the State's alternative theory that by virtue of M.J.'s diagnoses, she suffered a "mental impairment."[28] As stated, expert testimony explained the brain capacities and reasoning capabilities of a normal 10-year-old. Kelly testified that a normal 10-year-old does not have the capacity to appraise the nature of sexual conduct. Kelly then drew on her understanding of child brain development and

---

[25] *State v. Thomas*, 303 Neb. 964, 932 N.W.2d 713 (2019).

[26] *Id.*

[27] See *McCurdy, supra* note 6.

[28] See *In re Interest of K.M., supra* note 1, 299 Neb. at 645, 910 N.W.2d at 89. Accord *McCurdy, supra* note 6*.*

her direct interactions with M.J. when she opined that M.J. could not appraise the nature of sex. The jury was also able to observe M.J. and draw its own conclusions about M.J.'s capabilities, when she testified approximately 9 months after the incident.

We also find the evidence sufficient for the jury to conclude that Dady knew M.J. was incapable of resisting or appraising the nature of her conduct when she agreed to have sex with someone nearly twice her age in exchange for an "MP3 player." There was evidence presented that M.J. acted as a normal child when she and Dady spent time together. Prior to the incident, M.J.'s stepfather had a specific conversation with Dady explaining that M.J. was 10 years old. M.J. rode around the neighborhood on a "bike [with] flowers on it." When Dady wanted M.J. to come to the mall with him, M.J. said she would have to go ask her mother. On another occasion, M.J. had to cut short her visit with Dady in order to go home to eat lunch and to clean her room. Such facts indicate Dady had sufficient time to interact with M.J. and observe M.J.'s level of maturity and understanding. And when Dady was interviewed by law enforcement, he repeatedly emphasized that M.J. claimed to be older, thereby indicating he had some knowledge that M.J.'s age was a factor for whether she had the capacity to appraise the nature of her conduct. By the end of the police interview, Dady admitted M.J. appeared to be around 10 or 11 years old.

When viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[29] A rational jury could conclude that M.J. was incapable of appraising the nature of her conduct and that Dady knew or should have known that. We find no merit to Dady's arguments that the evidence was insufficient to support the jury's verdict.

---

[29] *McCurdy, supra* note 6.

Hearsay

[12] Dady contends that the testimony by M.J.'s mother and by Kelly concerning M.J.'s diagnoses was hearsay. However, the discussion between M.J., M.J.'s mother, and Kelly concerning M.J.'s past diagnoses falls squarely within Neb. Rev. Stat. § 27-803(3) (Reissue 2016) as a statement describing medical history. Evidence is admissible under § 27-803(3) when the party seeking to introduce the evidence demonstrates

> (1) that the circumstances under which the statements were made were such that the declarant's purpose in making the statements was to assist in the provision of medical diagnosis or treatment and (2) that the statements were of a nature reasonably pertinent to medical diagnosis or treatment by a medical professional."[30]

Although Kelly did not personally diagnose M.J., she testified that she learned of the diagnoses while doing a patient interview for the purpose of treating M.J. during her visit to the emergency room. She further testified that obtaining a patient history is an important part of her job and that she attempts to get a medical history from every patient she treats. The testimony of Kelly satisfies the requirements for evidence to be admissible under § 27-803(3).

[13] Although a Confrontation Clause objection was made during the motion to strike, the objection was not asserted or argued on appeal. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error.[31] Furthermore, the motion to strike was made only in relation to M.J.'s mother's testimony, and no Confrontation Clause objection was raised as to Kelly's testimony. The court did not err in admitting Kelly's testimony of M.J.'s mental health diagnoses over Dady's hearsay objection. M.J's mother's testimony regarding M.J.'s diagnoses was also hearsay, but did not fall

---

[30] *Mora, supra* note 7, 298 Neb. at 193-94, 903 N.W.2d at 253.

[31] *Anderson v. Babbe, ante* p. 186, 933 N.W.2d 813 (2019).

into a hearsay exception. However, the testimony of M.J.'s mother was cumulative of Kelly's admissible statements and thus qualifies as harmless error.[32]

## Exclusion of § 27-412
### Evidence

Dady asserts that his Sixth Amendment rights were violated by his being prevented from cross-examining M.J. concerning her other sexual encounters. Dady asserts that M.J.'s previous sexual behavior is relevant to show that she comprehended the nature of her sexual conduct. Evidence under § 27-412 should be admitted if it is of sufficient relevance to establish that the victim had prior knowledge of the same kind of sexual activities of which the defendant is accused.[33] Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[34]

In its motion in limine, the State argued that the evidence put forward by Dady was not relevant to the case at hand because the other encounters did not involve sexual intercourse. Furthermore, one of the encounters occurred after the incident with Dady, and the timing of one of the other two encounters was also disputed. The State argued that to the extent the other encounters did not involve intercourse and occurred after the incident with Dady, they were not relevant to show that M.J. could appraise the nature of sexual conduct at the time of the incident.

---

[32] See *State v. Hood*, 301 Neb. 207, 917 N.W.2d 880 (2018).

[33] See *State v. Earl*, 252 Neb. 127, 560 N.W.2d 491 (1997).

[34] See *Briggs, supra* note 8.

We have previously held such differences to be enough to warrant the exclusion of prior encounters.[35] In *State v. Earl*,[36] the defendant wanted to enter evidence of the 6-year-old victim's previous sexual conduct to show that the victim had an alternate source for knowledge about sex acts. The victim had had an encounter with two of his similarly aged cousins. During that encounter, the victim and his female cousins played house and lay on each other naked. The encounter between the victim and the defendant in *State v. Earl* involved a male-on-male assault that included fellatio. In considering the defendant's request under the previous rape shield statute, Neb. Rev. Stat. § 28-321 (Reissue 1995), the court concluded the incident involving the victim and his cousins was too different to be relevant in the defendant's case.[37]

In the present case, one of the encounters clearly occurred after the incident with Dady and the second encounter's timing is undetermined. This supports the ruling that the proffered evidence was irrelevant to showing that M.J. could appraise the nature of sexual intercourse at the time of the incident with Dady. Similarly to the comparison in *State v. Earl*, the proffered evidence of M.J.'s past encounters is categorically different from the encounter with Dady. M.J.'s previous encounters involved sexual touching of similarly aged children. M.J.'s encounter with Dady was a 10-year-old having sexual intercourse with an 18-year-old.

The trial court's ruling did not prevent Dady from presenting an effective defense; nor did it violate Dady's constitutional rights. Dady was allowed to cross-examine M.J.'s mother concerning the hospitalization related to the one encounter that occurred before the events of the present case. On these facts,

---

[35] See, *State v. Sanchez*, 257 Neb. 291, 597 N.W.2d 361 (1999); *Earl, supra* note 33.

[36] *Earl, supra* note 33.

[37] See *id.*

we cannot say that the trial court's ruling was unreasonable or untenable, nor that it was clearly against justice or conscience, reason, and evidence. The district court's ruling on the admissibility of M.J.'s other sexual encounters was not an abuse of discretion.

Having addressed the propriety of the court's final ruling regarding the admissibility of M.J.'s other sexual encounters, we address Dady's assertion that there was an irregularity in the proceedings of the court which prevented him from having a fair trial.[38] Dady argues that when the district court reversed its decision and informed defense counsel it would allow some of the § 27-412 evidence initially excluded, the defense adjusted its trial strategy to make use of this evidence.

Dady began questioning M.J. about certain events and was stopped during the cross-examination. The district court then declared it was reversing its decision again. Dady contends that the adjustment of trial strategy resulted in defense counsel's eliciting testimony about the hospitalizations in order to attribute the hospitalizations to M.J.'s previous sexual encounters rather than the mental-health-related reasons given by M.J.'s mother at trial.

The evidence proposed in the offer of proof was intended to provide the jury with an alternate explanation for two hospitalizations. Dady had already been able to offer such an explanation for one of those hospitalizations through the cross-examination of M.J.'s mother. The other sexual encounter that resulted in a hospitalization occurred after the incident with Dady. As explained above, such evidence is not relevant in establishing what M.J. knew about sex at the time of the incident. Nor is it relevant to show the state of M.J.'s mental health at the time of the incident.

The initial ruling on the evidence was based on Dady's pretrial notice under § 27-412 and the State's corresponding motion in limine. A motion in limine is a procedural step by

---

[38] See Neb. Rev. Stat. § 29-2101 (Reissue 2016).

which a court makes a preliminary determination; it is not a final order.[39] A change in a ruling on admissibility is not de facto unfair, and the alleged change in trial strategy is not supported in the record. Defense counsel began questioning M.J.'s mother about the hospitalizations before any change from the pretrial ruling occurred. Therefore, no irregularity which could be considered unfair is demonstrable on these facts.

Having addressed all of the grounds for Dady's motion for a new trial, we affirm the district court's denial of the motion for a new trial.

## Excessive Sentence

[14] The sentence ordered is within the statutory guidelines and will not be altered unless there was an abuse of discretion.[40]

> When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the violence involved in the commission of the crime. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.[41]

Dady asserts that the district court abused its discretion by not considering all of the required factors. The record shows, however, that the district court weighed the correct factors related to Dady's age, family background, mentality, criminal history, unsuccessful discharge from probation related to juvenile

---

[39] See *Golnick v. Callender*, 290 Neb. 395, 860 N.W.2d 180 (2015).

[40] See *State v. Erickson, supra* note 10.

[41] *State v. Chairez*, 302 Neb. 731, 740, 924 N.W.2d 725, 732 (2019).

charges, lack of effort in pursuing education and treatment while on probation, and potential to reoffend. Such consideration is not an abuse of discretion. Consequently, we affirm the district court's sentence.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.